R. Anthony MARRESE, M.D., and Bone
& Joint Surgeons, Inc.,
Plaintiffs-Appellants,

v.

INTERQUAL, INC., et al.,
Defendants-Appellees.

No. 83–1581.

United States Court of Appeals,
Seventh Circuit.

Argued March 29, 1984.

Decided Nov. 6, 1984.

As Amended Nov. 7, 1984.

Rehearing and Rehearing En Banc
Denied Dec. 27, 1984.

John J. Casey, Landesman & Schwartz, Chicago, Ill., for plaintiffs-appellants.

George W. Spellmire, Hinshaw, Culbertson, Moelman, Hoban & Fuller, Alfred C. Tisdahl, Jr., French, Rogers, Kezelis & Kominiarek, PC., Chicago, Ill., for defendants-appellees.

Before BAUER and COFFEY, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

COFFEY, Circuit Judge.

Plaintiffs-Appellants, R. Anthony Marrese, M.D., and Bone & Joint Surgeons, Inc., appeal the judgment of the United States District Court for the Northern District of Illinois dismissing the plaintiffs' claims under the Sherman Act §§ 1, 2, 15 U.S.C. §§ 1, 2, for lack of subject matter jurisdiction. We conclude that the defendants' conduct in reviewing Dr. Marrese's surgical procedures and recommending that his clinical privileges at Deaconess Hospital, in Evansville, Indiana, be revoked, is exempt from the Federal antitrust laws under the doctrine of "state action," and thus we affirm the dismissal of the plaintiffs' claims under the Sherman Act §§ 1, 2.

I

The record reveals that Dr. R. Anthony Marrese, is a Board certified orthopedic surgeon who specializes in the treatment of spinal disorders. Dr. Marrese is the sole shareholder of Bone & Joint Surgeons, Inc., an Indiana corporation with its principal office in Evansville, Indiana. He is licensed to practice medicine in the states of Illinois and Indiana and, at the commencement of this lawsuit, had clinical privileges to practice at Deaconess Hospi-

tal, a non-profit corporation located in Evansville, Indiana.[1]

In February 1978, a Special Ad Hoc Committee ("SAHC") comprised of selected members of the medical staff at Deaconess Hospital conducted an audit of the surgical "back" procedures performed at Deaconess.[2] The results of that audit raised questions concerning the "appropriateness of the surgeries performed by Dr. Marrese." Accordingly, the SAHC recommended to the medical staff at Deaconess that all of Dr. Marrese's lumbar laminectomy and spinal fusion cases be monitored, and that any case without a positive radiological finding be subjected to a mandatory second opinion. In August 1980, the SAHC retained Interqual, Inc., an independent, non-affiliated company engaged in the business of performing medical audits, to conduct a further audit of Dr. Marrese's lumbar and cervical surgical procedure. Based upon the findings of the Interqual audit, the SAHC recommended to the Medical Staff Executive Council at Deaconess that Dr. Marrese's clinical privileges be revoked. On April 28, 1982, the Medical Staff Executive Council adopted the recommendation of the SAHC but stayed implementation of Dr. Marrese's clinical privilege revocation, pending a hearing as required by the hospital's Fair Hearing Plan.

The Fair Hearing Plan at Deaconess was adopted by the medical staff in June 1979 "to provide every practitioner with one evidentiary hearing and with one appellate hearing in the event that any action is taken [including revocation of clinical privileges] by the Medical Staff Executive Council ... or the Board of Directors of the Hospital." The medical staff's authority to review professional practices within its hospital is provided for in the State of Indiana statutory code:

> "The governing board of the hospital shall be the supreme authority in the hospital
>
> *   *   *   *   *   *
>
> The medical staff of a hospital shall be an organized group which shall be responsible to the governing board ... and shall have the responsibility of reviewing the professional practices in the hospital for the purpose of reducing morbidity and mortality, and for the improvement of the care of patients in the hospital. *This review shall include, but shall not be limited to, the quality and necessity of the care provided patients....*"

Ind.Code § 16-10-1-6.5 (1982) (emphasis added). The Indiana statutory scheme for quality control of the medical profession further provides that the personnel of:

> "a committee having the responsibility of evaluation of qualifications of professional health care providers, or of patient care rendered by professional health care providers, or of the merits of a complaint against a professional health care provider that includes a determination or recommendation concerning the complaint
>
> *   *   *   *   *   *
>
> shall be immune from any civil action arising from any determination made in good faith in regard to evaluation of patient care...."[3]

---

1. At oral argument the plaintiffs' counsel informed this court that Dr. Marrese "is no longer practicing in Evansville," but counsel failed to provide this court with any information concerning Dr. Marrese's status at Deaconess Hospital, much less his underlying reason for no longer practicing in Evansville, Indiana. It is clear from the plaintiffs' first amended complaint that Dr. Marrese's clinical privileges at Deaconess had not been revoked prior to the filing of this lawsuit in July 1982.

2. According to the plaintiffs' first amended complaint, the "back" procedures audited by the SAHC included, *inter alia,* fifty lumbar laminectomies and forty spinal fusions performed by orthopedic surgeons on the staff at Deaconess Hospital.

3. The Indiana legislature defines good faith as "an act taken without malice after a reasonable effort to obtain the facts of the matter and in the reasonable belief that the action taken is warranted by the facts known." Ind.Code § 34-4-12.6-1(f) (1982).

Ind.Code §§ 34–4–12.6–1(c), 34–4–12.6–3(c) (1982).[4] The procedure to be followed in reviewing professional practices within a hospital is set forth in Ind.Code § 34–4–12.6–2(b):

"Any professional health care provider under investigation shall be permitted at any time to see any records accumulated by a peer review committee pertaining to his personal practice and shall be offered the opportunity to appear before the peer review committee with adequate representation to hear all charges and findings concerning his practice and to offer rebuttal information, which shall be a part of the record before any disclosure of the charges and findings hereunder."

The Fair Hearing Plan adopted by the medical staff at Deaconess affords any practitioner adversely affected by a recommendation or action of the Medical Staff Executive Council or the Board of Directors, the right to an evidentiary hearing.[5] The hearing is conducted before an evidentiary hearing committee, comprised of five members of the senior or active medical staff.[6] The practitioner may request to be represented by an attorney and/or may be accompanied by a member of the medical staff, and shall also be allowed to:

"(a) call and examine witnesses

(b) introduce exhibits

(c) cross-examine any witness on any matter relevant to the issues

(d) question the qualifications of any witness

(e) rebut any evidence

(f) request that the record of the hearing be made by use of a court reporter or an electronic recording unit."

At a hearing to review the revocation of a practitioner's clinical privileges, "the body whose adverse recommendation or action occasioned the hearing shall have the initial obligation to present evidence" in support of its recommendation. According to the Fair Hearing Plan at Deaconess, the burden then shifts to the practitioner to show "by a preponderance of the evidence that the grounds [for revocation] lack any substantial basis or that such basis or the conclusions drawn therefrom are either arbitrary, unreasonable, or capricious." Following this hearing, the committee compiles its findings and submits them along with a recommendation to either the Medical Staff Executive Council or the Board of Directors, depending upon which body initiated the adverse recommendation or action. After reviewing the committee's findings and recommendation, the council or hospital board affirms, modifies, or reverses the recommendation. If the decision is adverse to the practitioner, he has a

---

**4.** Effective April 1983, the Indiana legislature amended Ind. Code § 16–10–1–6.5 to provide in pertinent part:

"The governing board and its employees, agents, consultants, and attorneys have absolute immunity from civil liability for communications, discussions, actions taken, and reports made concerning disciplinary action or investigation taken or contemplated, if such reports or actions are made in good faith and without malice."

Ind.Code Ann. § 16–10–1–6.5(b) (Burns Supp. 1983).

**5.** According to the Fair Hearing Plan at Deaconess, a practitioner is entitled to an evidentiary hearing for the following recommendations or actions:

"(a) Denial of initial staff appointment

(b) Denial of reappointment

(c) Suspension of staff membership

(d) Revocation of staff membership

(e) Denial of requested advancement in staff category

(f) A change in staff category not acceptable to the practitioner

(g) Limitation of the right to admit patients

(h) Denial of requested department/service/section affiliation

(i) Denial of requested clinical privileges

(j) Reduction of clinical privileges

(k) Suspension of clinical privileges

(l) Revocation of clinical privileges

(m) Terms of probation

(n) Individual requirement of consultation

**6.** The five hearing committee members are appointed by the president of the medical staff when the hearing is occasioned by an adverse recommendation of the Medical Staff Executive Council. On the other hand, when the hearing is occasioned by an adverse recommendation of the governing hospital board, the board president appoints the five members of the hearing committee.

right of review before the joint conference committee of the hospital. The Fair Hearing Plan at Deaconess provides that "[t]he practitioner seeking the review may submit a written statement detailing the findings of fact, conclusions and procedural matters with which he disagrees, and his reasons for disagreement." Following submission of the practitioner's statement, the joint conference committee conducts a review hearing and based upon its findings, recommends to the hospital board that the adverse decision be affirmed, modified, or reversed. The board issues a final written decision and if the practitioner's hospital staff privileges are, in fact, revoked, he is entitled to appeal that decision through the Indiana state court system and challenge the "good faith" of the hospital staff members in reaching their conclusion. *See, e.g., Kiracofe v. Reid Memorial Hosp.,* Ind. App., 461 N.E.2d 1134, 1139–41 (1984); *Yarnell v. Sisters of St. Francis Hlth. Serv.,* Ind.App., 446 N.E.2d 359, 361–63 (1983).[7]

In July 1982, before the Board of Directors at Deaconess had issued their final decision revoking Dr. Marrese's clinical privileges, the plaintiffs (Dr. Marrese and his solely owned company, Bone & Joint Surgeons, Inc.) filed suit in the United States District Court for the Northern District of Illinois against Interqual, Inc., Deaconess Hospital and its Board of Directors in their individual capacity, and members of the SAHC and Executive Committee at Deaconess, including seven doctors, one hospital administrator, and one attorney.[8] The suit alleged that the defendants had conspired to restrain trade in violation of the Sherman Act § 1, had monopolized the market for orthopedic and neurological spinal surgical procedures in Evansville, Indiana in violation of the Sherman Act § 2, and had violated 42 U.S.C. § 1983 by adopt-

ing an anticompetitive, unfair, and unconstitutional Fair Hearing Plan under color of the Indiana medical peer review statute, Ind.Code § 34–4–12.6–1 *et seq.*[9] According to the plaintiffs' first amended complaint, "[b]eginning in early 1978 and continuing thereafter to the present, the Defendants have engaged in an unlawful conspiracy to exclude DR. MARRESE from the Evansville, Indiana marketing area by falsely charging that he is unqualified to practice and compete therein." The complaint alleged that the defendants "formulat[ed] and effectuat[ed]" this conspiracy through their actions as members of or consultants to the hospital board, the SAHC, and the Medical Staff Executive Council at Deaconess. The plaintiffs sought money damages for the alleged Federal antitrust violations and, pursuant to the Clayton Act § 16, 15 U.S.C. § 26, a permanent injunction restraining defendants from continuing to engage in Federal antitrust violations. In addition, the plaintiffs requested a permanent injunction "enjoining the President of the Medical Staff ... from naming a committee to sit in review of the recommendation of the Executive Committee of the Medical Staff."

For purposes of establishing the district court's subject matter jurisdiction over the alleged violations of the Sherman Act §§ 1, 2, the plaintiffs claimed that the defendants' activities had a substantial and adverse effect upon interstate commerce. In support of this position, the plaintiffs alleged that:

"Approximately 45% of the patients treated by DR. MARRESE travel from Western Kentucky and Southern Illinois into the State of Indiana and the vast majority of these patients are treated by DR. MARRESE at DEACONESS HOSPITAL.... In addition, DR. MARRESE

---

**7.** We express no view concerning the defendants' "good faith" and/or "bad faith" in the present case, as that issue is not presently before the court.

**8.** The record reveals that the plaintiffs filed their initial complaint in this action on July 12, 1982. Some two weeks later, on July 27, 1982,

the plaintiffs filed their first amended complaint.

**9.** The plaintiffs' first amended complaint also included a pendent state claim, alleging that the defendants' actions constituted a tortious interference with business relations.

is a team surgeon for an Illinois high school, and in this capacity has occasion to travel into the State of Illinois, treat injured athletes and when necessary brings them back to the DEACONESS HOSPITAL for the purpose of providing medical treatment for them. In the regular course of his treatment of both his interstate and in-state patients, Plaintiff, DR. MARRESE, through Plaintiff's Bone and Joint Surgeons, Inc. purchases medicine, equipment and related supplies from out-of-state purveyors, derives revenues from the Federal Health Care Program commonly known as Medicare and Medicaid as well as from private out-of-state insurance companies and pays management and accounting fees to various out-of-state consultants. The total amount of said out-of-state purchases, revenues, and fees exceed the sum of $500,000.00 [annually]."

    *     *     *     *     *     *

If Defendants' conspiracy is successful in its ultimate objective of driving DR. MARRESE from the Evansville, Indiana marketing area, he will ... be unable to practice orthopedic medicine anywhere in the continental United States because of the cost of medical malpractice insurance, and because no other hospital could afford the risk of accepting DR. MARRESE on its staff." [10]

The plaintiffs further alleged that:

"Approximately 25% of the HOSPITAL'S patients travel from Kentucky and Illinois to the HOSPITAL for the purpose of receiving medical and surgical care from its professional staff.

The HOSPITAL'S regular billings with respect to said out-of-state patients are not less than TEN MILLION DOLLARS ($10,000,000.00) per year.

**10.** The record before this court reveals that the plaintiffs' allegation of out-of-state purchases, revenues, and fees in excess of $500,000 refers to an annual sum.

**11.** The court ruled that the plaintiffs' claim of an anticompetitive, unfair, and unconstitutional Fair Hearing Plan at Deaconess Hospital failed

The HOSPITAL also purchases medical supplies and equipment in an amount not less than FIVE MILLION DOLLARS ($5,000,000.00) per year from various out-of-state sources."

In February 1983, the district court dismissed the plaintiffs' first amended complaint in its entirety. The court found that:

"With respect to interstate commerce, plaintiffs have alleged that Dr. Marrese treats people who travel in interstate commerce; that they purchase medicine and related supplies from out-of-state; that Dr. Marrese travels in interstate commerce as part of his business; and that they receive revenues from out-of-state sources such as insurance companies and Medicare."

Based upon these findings, the court ruled, *inter alia*, that:

"Plaintiffs have not alleged what effect the defendants attempts to revoke Dr. Marrese's clinical privileges have had on the aspects of interstate commerce alleged. Other than generalized, conclusory allegations plaintiffs have failed to allege any substantial effect on interstate commerce.... Thus, because the court concludes that defendants' allegedly unlawful actions do not have a substantial effect on interstate commerce, [the plaintiffs' claims under the Sherman Act §§ 1, 2] must be dismissed for lack of subject matter jurisdiction." [11]

In March 1983, the plaintiffs filed a motion for reconsideration of the district court's order dismissing the first amended complaint and also filed a motion for leave to file a second amended complaint. The court denied both motions ruling that, "[m]any of the allegations in the Second Amended Complaint are identical to paragraphs in the First Amended Complaint. To the extent that there are differences between the two complaints, they are dif-

to allege sufficient "state action" to state a claim under 42 U.S.C. § 1983. The court further ruled that because the federal claims were dismissed, it no longer retained jurisdiction over the pendent state law claim. The plaintiffs do not appeal these decisions.

ferences merely of degree not of sub-stance."[12] On appeal, the plaintiffs contend that the district court erred in dismissing the plaintiffs claims under the Sherman Act §§ 1, 2, for failure to allege a substantial and adverse effect upon interstate commerce.

## II

The Sherman Act prohibits "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce among the several States," 15 U.S.C. § 1 (1982), and also prohibits "monopoliz[ing] any part of the trade or commerce among the several States." 15 U.S.C. § 2 (1982). It is axiomatic that in pleading a cause of action under the Sherman Act §§ 1, 2, the plaintiff must adequately allege the jurisdictional requirement of interstate commerce. *See McLain v. Real Estate Bd. of New Orleans*, 444 U.S. 232, 241–42, 100 S.Ct. 502, 508–09, 62 L.Ed.2d 441 (1980) (*"McClain"*); *Hospital Building Co. v.*

*Rex Hospital Trustees*, 425 U.S. 738, 743, 96 S.Ct. 1848, 1851, 48 L.Ed.2d 338 (1976) (*"Hospital Building Co."*). Thus, the plaintiff's complaint must allege sufficient facts to establish that the defendant's alleged illegal conduct is "in interstate commerce" or has a "substantial and adverse effect" upon interstate commerce. *McLain*, 444 U.S. at 241–42, 100 S.Ct. at 508–09; *Hospital Building Co.*, 425 U.S. at 743, 96 S.Ct. at 1851. One of the two threshold issues before this court is whether the plaintiffs in the instant case have alleged facts sufficient at the pleading stage of the proceeding to satisfy the jurisdictional requirement of interstate commerce under the Sherman Act.[13]

We note at the outset that "[i]n reviewing the dismissal of a complaint, 'the ... factual allegations of the complaint are taken as true.'" *Mid-America Reg. Bar. v. Will Cty. Carpenters*, 675 F.2d 881, 883 (7th Cir.), *cert. denied*, 459 U.S. 860, 103 S.Ct. 132, 74 L.Ed.2d 114 (1982) (quoting

**12.** The district court denied the plaintiffs' motion for leave to file a second amended complaint and thus that complaint was never made a part of the district court record. It is clear, however, that the judge received and reviewed a copy of the second amended complaint as did the defendants who filed a memorandum in opposition to the plaintiffs' motion for leave to file an amended complaint. On appeal, the plaintiffs have presented this court with a copy of the second amended complaint which alleges, in addition to the allegations of the first amended complaint, that:

"Approximately 300 patients per year travel from Western Kentucky and Southern Illinois into the State of Indiana for treatment by DR. MARRESE. Each patient is seen by DR. MARRESE on six separate occasions for a total of approximately 1,800 visits per year by out-of-state patients into the State of Indiana from DR. MARRESE. These patients are billed approximately $1,000,000.00 per year by DR. MARRESE and approximately $10,-000,000.00 by the HOSPITAL.... The vast majority of these patients are treated by DR. MARRESE at least once at the HOSPITAL and a large percentage of these cases involve complex spinal surgery. If DR. MARRESE's privileges at the HOSPITAL are terminated, these patients will not cross state lines into the State of Indiana for their medical treatment for they come to DR. MARRESE because of his superior expertise in spinal diagnosis and treatment."

The second amended complaint also alleges that Dr. Marrese had contracted to purchase a $500,-000 computerized tomography body scanner from a New Jersey firm. Specifically, Dr. Marrese alleges that he had made a down payment on the machine, had arranged financing with a Missouri firm, and had entered into an agreement with an out-of-state physician, a "national expert in the field of computerized tomagraphy scanning," to read and interpret the specialized x-rays. Dr. Marrese claims that as a result of the defendants' alleged illegal conduct, he was forced to cancel the agreement to purchase the scanner, the financing arrangement, and the x-ray reading agreement with the out-of-state physician.

**13.** The record reveals that at the pleading stage of this proceeding the defendants filed a motion to dismiss the plaintiffs' complaint under Fed.R. Civ.P. 12(b)(6) for failure to state a claim upon which relief could be granted. For purposes of the Sherman Act claims, the district court treated the defendants' motion as a motion to dismiss for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1), and dismissed the claims. According to the Supreme Court in *Hospital Building Co.*, the jurisdictional requirement of interstate commerce may be analyzed under Fed.R.Civ.P. 12(b)(1) or 12(b)(6), "the critical inquiry is into the adequacy of the nexus between [defendants'] conduct and interstate commerce that is alleged in the complaint." 425 U.S. at 742 n. 1, 96 S.Ct. at 1851 n. 1.

*Ashbrook v. Hoffman,* 617 F.2d 474, 475 (7th Cir.1980)). According to the plaintiffs' first amended complaint, approximately forty-five percent of Dr. Marrese's patients travel from Illinois and Kentucky into Indiana for treatment.[14] The complaint alleges that the vast majority of these patients are treated at Deaconess Hospital in Evansville, Indiana. In addition, Dr. Marrese claims that he travels into Illinois to treat injured athletes, and when necessary, brings them to Deaconess Hospital for medical treatment. Dr. Marrese further claims that he purchases medicine, equipment, and related supplies from out-of-state purveyors, derives revenues from Medicare, Medicaid, and private out-of-state insurance companies, and pays management and accounting fees to out-of-state consultants. These out-of-state purchases, revenues, and fees allegedly exceed $500,000 annually. Moreover, according to the plaintiffs' first amended complaint, approximately twenty-five percent of the patients receiving medical and surgical care at Deaconess Hospital travel from Illinois and Kentucky, accounting for $10,000,000 in annual hospital billings. The complaint alleges that the hospital purchases approximately $5,000,000 in medical supplies and equipment annually, from out-of-state sources. Finally, Dr. Marrese claims that upon revocation of his clinical privileges at Deaconess, he will no longer be able to practice orthopedic medicine in Evansville, Indiana or anywhere in the United States because no hospital will be able to afford the risk of granting Dr. Marrese staff privileges. It is the plaintiffs' position that these allegations are sufficient, at the pleading stage of the proceeding, to establish a "substantial and adverse effect" upon interstate commerce, and thus satisfy the jurisdictional requirement of interstate commerce under the Sherman Act.

In *Williams v. St. Joseph Hospital,* 629 F.2d 448 (7th Cir.1980), this court set forth the general rule that "medical practice *per se* and without more is a local activity. To

bring it within reach of the [Federal] antitrust laws a substantial and adverse effect upon interstate commerce is requisite." 629 F.2d at 454 (citing *Polhemus v. American Medical Assn.,* 145 F.2d 357, 359 (10th Cir.1944)). "As long as the restraint in question 'substantially and adversely affects interstate commerce,' the interstate commerce nexus required for Sherman Act coverage is established." *Hospital Building Co.,* 425 U.S. at 743, 96 S.Ct. at 1851 (citations omitted). According to the Supreme Court in *McLain,* the defendant's activities must "be shown 'as a matter of practical economics' to have a not insubstantial effect on the interstate commerce involved." 444 U.S. at 246, 100 S.Ct. at 511 (citing *Hospital Building Co.,* 425 U.S. at 745, 96 S.Ct. at 1852). Though each case involves a unique set of facts, "[i]f it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze." *Hospital Building Co.,* 425 U.S. at 743, 96 S.Ct. at 1851 (quoting *Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 195, 95 S.Ct. 392, 398, 42 L.Ed.2d 378 (1974)); *Williams v. St. Joseph Hospital,* 629 F.2d at 453 n. 11; *Tiger Trash v. Browning-Ferris Industries, Inc.,* 560 F.2d 818, 825–26 (7th Cir. 1977), *cert. denied,* 434 U.S. 1034, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978) (quoting *United States v. Women's Sportswear Assn.,* 336 U.S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805 (1949)).

In *Hospital Building Co.,* the Supreme Court stated that "[a]n effect can be 'substantial' under the Sherman Act even if its impact on interstate commerce falls far short of causing enterprises to fold or affecting market price." 425 U.S. at 745, 96 S.Ct. at 1852. According to the Court, if the allegations of the plaintiff's complaint "fairly claim that the alleged conspiracy, to the extent it is successful, will place 'unreasonable burdens on the free and uninterrupted flow' of interstate commerce," that is sufficient, at the pleading stage of a

---

**14.** Due to the fact that the plaintiffs' second amended complaint was never made a part of the district court record, this court limits its

review to the plaintiffs' first amended complaint.

proceeding, to establish a substantial effect upon interstate commerce under the Sherman Act. *Id.* at 746, 96 S.Ct. at 1853. This court has added that under the "substantial effect" test, "it is unnecessary for an antitrust plaintiff to allege the defendant 'had the purposeful goal of affecting interstate commerce' ... or that 'the conspiracy threaten[s] the demise of out-of-state businesses or that the conspiracy affect[s] market prices.'" *Tiger Trash v. Browning-Ferris Industries, Inc.,* 560 F.2d at 826 (brackets original) (quoting *Hospital Building Co.,* 425 U.S. at 745, 746, 96 S.Ct. at 1852, 1853) (*"Tiger Trash "*).

Indeed, in *Tiger Trash,* the plaintiff alleged that the defendant, Browning-Ferris Industries ("BFI"), was attempting to monopolize the solid waste collection service of Evansville, Indiana and Henderson, Kentucky, in violation of the Sherman Act § 2. According to the undisputed facts, BFI was an Indiana corporation with twenty customer accounts in Henderson, Kentucky, comprising approximately five percent of BFI's total accounts. The Kentucky accounts produced annual revenues of $30,000 amounting to approximately three to four percent of the annual revenues produced by BFI's Evansville, Indiana accounts. In addition, BFI maintained $6,000 worth of equipment in Kentucky on a permanent basis and used another $100,000 worth of equipment within the state. On the issue of whether or not these facts were sufficient to satisfy the test of "substantial and adverse effect" upon interstate commerce, at the pleading stage of the proceeding, this court ruled that:

> "Plaintiff Tiger Trash may be able to prove that defendants' monopolization caused an effect on interstate commerce 'that is more than merely inconsequential.' *Woods Exploration & Producing Co. v. Aluminum Co. of America,* 438 F.2d 1286, 1303 (5th Cir.1971), *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972). Since the relation of the alleged restraints to interstate commerce and their effect upon it are not

'clearly nonexistent' summary judgment for BFI Indiana was inappropriate.

\* \* \* \* \* \*

What the proofs will show is another matter, but at least plaintiff must be permitted to show (if it can) that an interstate market, the Henderson-Evansville area, was being monopolized by defendants. *Hospital Building, supra,* 425 U.S. at 747 n. 5 [96 S.Ct. at 1853 n. 5]"

*Id.* at 826. Similarly, the Supreme Court has stated that at the pleading stage of a proceeding:

> "[A] complaint should not be dismissed unless 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-102, 2 L.Ed.2d 80 (1957); see 5 C. Wright & A. Miller, Federal Practice and Procedure §§ 1202, 1205-1207, 1215-1224, 1228 (1969). This rule applies with no less force to a Sherman Act claim, where one of the requisites of a cause of action is the existence of a demonstrable nexus between the defendants' activity and interstate commerce."

*McLain,* 444 U.S. at 246, 100 S.Ct. at 511. *See also Bunker Ramo Corp. v. United Business Forms, Inc.,* 713 F.2d 1272, 1282 (7th Cir.1983); *Williams v. St. Joseph Hospital,* 629 F.2d at 453-54.

Since the decisions in *Hospital Building Co.* and *McLain,* the Federal courts have embarked upon a new and vastly expanded interpretation of the interstate commerce requirement under the Sherman Act. As a result, the courts have been deluged with complaints alleging that a hospital's denial or revocation of a doctor's staff privileges constitutes a restraint of trade and/or an attempt to monopolize trade in violation of the Sherman Act §§ 1, 2. *See Pontius v. Children's Hospital,* 552 F.Supp. 1352, 1362-63 (W.D.Pa.1982); Kissam, Webber, Bigus & Holzgraefe, *Antitrust and Hospital Privileges: Testing the Conventional Wisdom,* 70 Cal.L.Rev. 595 (1982). A common element in these hospital staff denial

or revocation cases is a threshold determination by the court of whether or not the doctor's complaint alleges facts sufficient to satisfy the jurisdictional requirement of interstate commerce under the Sherman Act. For example, in *Cardio-Medical Assoc. v. Crozer-Chester Med. Ctr.*, 721 F.2d 68 (3rd Cir.1983) (*"Cardio-Medical"*), four cardiologists claimed that their denial of specialized staff privileges, preventing them from using advanced equipment at the defendant hospital, violated the Sherman Act §§ 1, 2. The plaintiffs alleged that twelve to fifteen percent of their patients were from out-of-state, and that these patients accounted for $100,000 in annual revenues. The plaintiffs further alleged that in the absence of the defendant's illegal activity, they would have another twelve to fifteen percent interstate patients, additional interstate revenues, and additional purchases of out-of-state medications. The court held that:

> "Interferences with the interstate travel of patients, the interstate payment of fees, and the interstate purchase of medication are well-recognized methods for demonstrating an effect on interstate commerce in antitrust litigation. We therefore conclude that plaintiffs' pleadings meet the jurisdictional requirements of the Sherman Act...."

721 F.2d at 76 (citations omitted). In accord with the court's broad language in *Cardio-Medical,* Federal courts have relied upon the treatment of out-of-state patients, the receipt of Medicare, Medicaid, and out-of-state insurance funds, and the purchase of medicine, equipment, and medical supplies from out-of-state purveyors by the plaintiff doctor and/or the defendant hospital, to rule that the doctor's complaint satisfies the jurisdictional requirement of interstate commerce under the Sherman Act.

*See, e.g., Weiss v. York Hospital,* 745 F.2d 786 at 824–825, n. 63 (3d Cir.1984) (osteopath denied staff privileges); *Mishler v. St. Anthony's Hosp. Systems,* 694 F.2d 1225, 1227–28 (10th Cir.1981) (neurosurgeon excluded from emergency room referral list); *Crane v. Intermountain Health Care, Inc.,* 637 F.2d 715, 725 (10th Cir.1981) (en banc) (pathologist denied staff privileges); *Stone v. William Beaumont Hospital,* 1983–2 Trade Cases 69,475, 69,479 (E.D. Mich.1983) (cardiologist denied staff privileges); *Konik v. Champlain Val. Physicians Hosp. Med. Ctr.,* 561 F.Supp. 700, 709–10 (N.D.N.Y.1983), *aff'd,* 733 F.2d 1007 (2nd Cir.1984) (anesthesiologist denied use of hospital facilities); *Pontius v. Children's Hospital,* 552 F.Supp. at 1361–62; (cardiovascular surgeon denied reappointment to staff); *McElhinney v. Medical Protective Co.,* 549 F.Supp. 121, 127–28 (E.D.Ky.1982) (surgeon denied reappointment to staff); *Pao v. Holy Redeemer Hospital,* 547 F.Supp. 484, 489–90 (E.D.Pa. 1982) (opthalmologist denied staff privileges); *Everhart v. Jane C. Stormont Hospital,* 1982–1 Trade Cases 73,895, 73,896 (D.Kan.1982) (cardiovascular surgeon denied staff privileges); *Williams v. Kleaveland,* 534 F.Supp. 912, 918 (W.D.Mich.1981) (doctor denied reappointment to staff); *McDonald v. St. Joseph's Hospital of Atlanta,* 524 F.Supp. 122, 126–30 (N.D.Ga.1981) (urological surgeon denied staff privileges); *Robinson v. Magovern,* 521 F.Supp. 842, 876 (W.D.Pa.1981), *aff'd without opinion,* 688 F.2d 824 (3rd Cir.), *cert. denied,* 459 U.S. 971, 103 S.Ct. 302, 74 L.Ed.2d 283 (1982) (thoracic surgeon denied staff privileges); *Malini v. Singleton & Associates,* 516 F.Supp. 440, 442–43 (S.D.Tex.1981) (radiologist denied staff privileges); *Feldman v. Jackson Memorial Hospital,* 509 F.Supp. 815, 819–21 (S.D.Fla.1981) (podiatrist denied membership on medical staff).[15]

---

**15.** We note that courts have also dismissed doctors' claims under the Sherman Act, for the denial or revocation of hospital staff privileges, due to the plaintiff doctors' failure to allege a sufficient interstate commerce nexus. *See Hayden v. Bracy,* 744 F.2d 1338 at 1343–1344 (8th Cir.1984); *Furlong v. Long Island College Hosp.,* 710 F.2d 922, 927–28 (2d Cir.1983); *Capili v. Shott,* 620 F.2d 438, 439 (4th Cir.1980) (per curiam); *Wolf v. Jane Phillips Episcopal-Memorial Med. Ctr.,* 513 F.2d 684, 687–88 (10th Cir. 1975); *Moles v. Morton F. Plant Hospital, Inc.,* 1980–1 Trade Cases 77,186, 77,189–90 (M.D.Fla. 1978), *aff'd without opinion,* 617 F.2d 293 (5th

■ In the instant case, the plaintiffs' first amended complaint alleges that Dr. Marrese treats out-of-state patients; purchases medicine, equipment, and medical supplies from out-of-state purveyors; derives revenues from Medicare, Medicaid, and out-of-state private insurance companies; and pays management and accounting fees to out-of-state consultants. The plaintiffs' complaint further alleges that the impending revocation of Dr. Marrese's clinical privileges at Deaconess will prevent him from practicing orthopedic medicine in Evansville, Indiana or anywhere in the United States. Based upon these allegations, and the Federal courts' expansive interpretation of the interstate commerce requirement under the Sherman Act, it may be that the plaintiffs can demonstrate a substantial and adverse effect upon interstate commerce as a matter of practical economics. At this point we cannot say beyond doubt that the plaintiffs will be unable to prove a set of facts that will establish this required effect upon interstate commerce.[16] It is true that at the time the plaintiffs filed their first amended complaint, Dr. Marrese's clinical privileges at Deaconess had not yet been revoked and thus, no substantial and adverse impact upon interstate commerce had yet occurred. The Supreme Court has stated, however, that jurisdiction is not defeated "by plaintiff's failure to quantify the adverse impact of defendant's conduct." *McLain*, 444 U.S. at 243, 100 S.Ct. at 509.

According to the Court, "[e]ven where there is an inability to prove that concerted activity has resulted in legally cognizable damages, jurisdiction need not be impaired, though such a failure may confine the available remedies to injunctive relief." *Id.* In light of the expansive interpretation of the interstate commerce requirement under the Sherman Act, and the fact that the plaintiffs seek injunctive relief under the Clayton Act § 16, we hold that the plaintiffs' first amended complaint alleges facts sufficient at the pleading stage of the proceeding to establish the jurisdictional requirement of interstate commerce under the Sherman Act, thus satisfying one of the two threshold issues before this court.

We hasten to note that our analysis of the plaintiffs' first amended complaint does not end with a determination of this jurisdictional issue of interstate commerce under the Federal antitrust laws. Rather a thorough reading of the plaintiffs' complaint reveals that the defendants' alleged conspiracy to "exclude DR. MARRESE from the Evansville, Indiana marketing area" was formulated and effectuated through the defendants' actions as members of or consultants to the hospital board, the SAHC, and the Medical Staff Executive Council at Deaconess. Indeed, the complaint alleges that "[i]n formulating and effectuating their ... conspiracy to eliminate plaintiffs as competitors in the relevant market and particularly for patients treated at the HOSPITAL, defendants fur-

---

Cir.), *cert. denied,* 449 U.S. 919, 101 S.Ct. 317, 66 L.Ed.2d 147 (1980).

**16.** In *Western Waste Service v. Universal Waste Control,* 616 F.2d 1094 (9th Cir.), *cert. denied,* 449 U.S. 869, 101 S.Ct. 205, 66 L.Ed.2d 88 (1980), the Ninth Circuit interpreted *McLain* to mean "that it was not necessary for the alleged antitrust violations complained of to have affected interstate commerce as long as *defendants'* business activities, independent of the violations, affected interstate commerce." 616 F.2d at 1097 (emphasis added). In *Crane v. Intermountain Health Care,* 637 F.2d at 724, the Tenth Circuit stated that "we do not believe *McLain* signals a shift in analytical focus away from the challenged activity and towards the defendant's general or ovrall business. The analytical focus continues to be on the nexus,

assessed in practical terms, between interstate commerce and the challenged activity." In the instant case, we need not reach the issue of whether the plaintiffs could rely upon the interstate business activities of defendant, Deaconess Hospital, to satisfy the jurisdictional requirement of interstate commerce under the Sherman Act. *See Bunker Ramo Corp. v. United Business Forms, Inc.,* 713 F.2d at 1282 (this court does not find it necessary to choose between the various interpretations of *McLain*). Based upon the plaintiffs' allegations that Dr. Marrese treats out-of-state patients and has interstate purchases, revenues, and fees in excess of $500,000 annually, it may well be that the plaintiffs can demonstrate a substantial and adverse impact upon interstate commerce. *Accord Cardio-Medical Associates,* 721 F.2d at 76.

ther specifically agreed and conspired" in February 1978, to conduct an internal audit of the "back" procedures, including lumbar laminectomies and spinal fusions, performed at Deaconess; in August 1980, to retain Interqual, Inc. to conduct an independent audit of Dr. Marrese's surgical "back" procedures; to recommend, based upon the findings of the Interqual audit, that Dr. Marrese's clinical privileges be revoked; and in April 1982, on behalf of the Medical Staff Executive Council, to adopt the recommendation that Dr. Marrese's clinical privileges at Deaconess be revoked. Thus, according to the plaintiffs' first amended complaint, the defendants' alleged illegal conduct under the Sherman Act consists of their actions as members of or consultants to the hospital board, the SAHC, and the Medical Staff Executive Council, in reviewing Dr. Marrese's surgical procedures and recommending that his clinical privileges at Deaconess be revoked. In effect, the plaintiffs' Federal antitrust lawsuit is an attack upon the defendants' overall conduct as participants in the medical peer review process at Deaconess Hospital and their motives in recommending that Dr. Marrese's clinical privileges be revoked.

■ In response to the allegations contained within the plaintiffs' first amended complaint, the focus of our analysis shifts to a review of the defendants' conduct in recommending that Dr. Marrese's clinical privileges be revoked. The plaintiffs' first amended complaint, dismissed in its entirety by the district court, clearly states that:

"The professional staff of any hospital in the State of Indiana is *authorized*, pursuant to 31 [sic] Burns Indiana Statute 4-12-6(2)(c)(B) [Ind.Code 34-4-12.6-1(c)(2) ] to establish a 'Peer Review Committee', which is a committee charged with the responsibility of evaluating the qualifications of professional health care providers at a hospital. DR. MARRESE is a 'professional health care provider' within the meaning of said statute.

Defendant HOSPITAL attempted to implement the provisions of that statute on June 2, 1980 [sic] by adopting a 'Fair Hearing Plan' ...."

(Emphasis added). As a result of the plaintiffs' factual assertions that Ind.Code § 34-4-12.6-1 authorizes hospitals to establish peer review committees to evaluate staff members' qualifications and that Deaconess Hospital acted to implement the provisions of that statute, we must consider the second threshold issue; whether the defendants' conduct is "clearly articulated and affirmatively expressed as [Indiana] state policy" and "actively supervised" by the State so as to be exempt from the Federal antitrust laws under the doctrine of state action. *See Hoover v. Ronwin*, —— U.S. ——, 104 S.Ct. 1989, 1995, 80 L.Ed.2d 590 (1984); *California Liquor Dealers v. Midcal Aluminum*, 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980) ("*California Liquor Dealers*"). Such an analysis at the pleading stage of the proceeding is proper because the state action doctrine provides an *exemption* from the Federal antitrust laws and, if applicable, allows for dismissal of the complaint. *See, e.g., Hoover v. Ronwin*, 104 S.Ct. at 1994; *Gambrel v. Kentucky Board of Dentistry*, 689 F.2d 612, 613-21 (6th Cir.1982), *cert. denied*, 459 U.S. 1208, 103 S.Ct. 1198, 75 L.Ed.2d 441 (1983); *Benson v. Arizona State Bd. of Dental Examiners*, 673 F.2d 272, 274-76 (9th Cir.1982).

■ We initially note that the district court, in dismissing the plaintiffs' first amended complaint, did not address the issue of state action. The general rule is that "a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976); *Sharp v. Ford Motor Credit Co.*, 615 F.2d 423, 424 n. 1 (7th Cir.1980). It is clear, however, that the issue of state action has been addressed in the parties' briefs before this court and that "[t]he matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." *Singleton v. Wulff*, 428 U.S. at

121, 96 S.Ct. at 2877.[17] In the instant case the plaintiffs challenge the defendants' conduct and motives as participants in the medical peer review process at Deaconess Hospital. A review of the plaintiffs' complaint along with the parties' briefs and the relevant Indiana statutory law reveals that the medical peer review process in the State of Indiana was developed and enacted by the Indiana legislature to regulate and improve the quality of medical care within the state. *See* Ind.Code. §§ 16–10–1–1 *et seq.*, 25–22.5–2–1 *et seq.*, 34–4–12.6–1 *et seq.* This comprehensive statutory scheme mandates hospital medical staffs to review the professional practices and procedures of hospital staff members, *see* Ind.Code § 16–10–1–6.5, and authorizes the formation of peer review committees to perform this review process, *see* Ind.Code § 34–4–12.6–1(c). In light of this comprehensive statutory scheme in the State of Indiana, the plaintiffs' allegation that Deaconess Hospital acted to implement the provisions of this statutory scheme, and the fact that the state action doctrine *exempts* conduct that is "clearly articulated and affirmatively expressed as state policy" and "actively supervised" by the State from the Federal antitrust laws, this court is "justified in resolving [the state action] issue not passed on below...." *Singleton v. Wulff*, 428 U.S. at 121, 96 S.Ct. at 2877.

The doctrine of state action originated in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) (*"Parker"*), where a raisin producer in the State of California challenged a state statute that authorized "programs for the marketing of agricultural commodities produced in the state, so as to restrict competition among the growers and maintain prices in the distribution of their commodities to packers." 317 U.S. at 346, 63 S.Ct. at 311. According to the Supreme Court, the program restricting the marketing of raisins in California:

"derive[d] its authority and its efficacy from the legislative command of the state and was not intended to operate or

become effective without that command. *We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature.* In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress."

*Id.* at 350–51, 63 S.Ct. at 313–14 (emphasis added). *See also Hoover v. Ronwin*, 104 S.Ct. at 1995.

■ Since the seminal decision in *Parker*, the Supreme Court has further refined the doctrine of "state action." *See, e.g., Goldfarb v. Virginia State Bar*, 421 U.S. 773, 791, 95 S.Ct. 2004, 2015, 44 L.Ed.2d 572 (1975) (state bar association's enforcement of a minimum legal fee schedule not exempt under *Parker* because not compelled by state); *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 591–92, 96 S.Ct. 3110, 3117–18, 49 L.Ed.2d 1141 (1976) (opinion of Stevens, J.) (private utility company's regulation of light bulbs, approved by state and required to be continued until new tariff is filed, not exempt under *Parker*); *Bates v. State Bar of Arizona*, 433 U.S. 350, 362–63, 97 S.Ct. 2691, 2698–99, 53 L.Ed.2d 810 (1977) (enforcement of clearly articulated disciplinary rules by state supreme court, acting in its legislative capacity, exempt under *Parker*); *Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 415, 98 S.Ct. 1123, 1138, 55 L.Ed.2d 364 (1978) (opinion of Brennan, J.) (city's operation of electrical utility system exempt under *Parker* if state contemplated the action complained of when it authorized city to operate in that area); *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 439 U.S. 96, 109, 99 S.Ct. 403, 411, 58 L.Ed.2d 361 (1978) (state board's enforcement of a clearly ar-

---

**17.** On August 10, 1984, the parties were ordered to furnish the court with supplemental briefs, analyzing the applicability of the "state action" doctrine in the present case. The plaintiffs and defendants each submitted a supplemental and a reply brief on this issue.

ticulated, affirmatively expressed state regulation of automobile dealerships is exempt under *Parker*); *California Liquor Dealers*, 445 U.S. at 105–06, 100 S.Ct. at 943–44 (wine wholesaler's enforcement of a clearly articulated state system for wine pricing is not exempt under *Parker* because the state neither establishes nor reviews the price schedules, nor regulates the terms of fair trade contracts); *Community Communications Co. v. Boulder*, 455 U.S. 40, 55, 102 S.Ct. 835, 842, 70 L.Ed.2d 810 (1982) (municipality's enforcement of its cable television ordinance is not exempt under *Parker* because the state's position is one of mere neutrality respecting the municipality's actions). Most recently, the Court in *Hoover v. Ronwin*, reaffirmed its rationale in *Parker* that "when a state legislature adopts legislation, its actions constitute those of the State ... and *ipso facto* are exempt from the operation of the antitrust laws." 104 S.Ct. at 1995. The Court added that a "[c]loser analysis is required when the activity at issue is not directly that of the legislature ... but is carried out by others pursuant to state authorization." *Id.* It is "important to ensure that the anti-competitive conduct of the State's representative was contemplated by the State." *Id. See also Lafayette v. Louisiana Power & Light Co.*, 435 U.S. at 413–15, 98 S.Ct. at 1136–38 (opinion of Brennan, J.); P. Areeda, *Antitrust Law* ¶ 212.3 at 53–54 (Supp.1982). According to the Court:

"If the replacing of entirely free competition with some form of regulation or restraint was not authorized or approved by the State then the rationale of *Parker* is inapposite. As a result, in cases involving the anti-competitive conduct of a nonsovereign state representative the Court has required a showing that the

conduct is pursuant to a 'clearly articulated and affirmatively expressed state policy' to replace competition with regulation. The Court also has found the degree to which the state legislature ... supervises its representative to be relevant to the inquiry."

*Hoover v. Ronwin*, 104 S.Ct. at 1995 (citations omitted).[18] Thus, our review of the defendants' conduct in reviewing Dr. Marrese's surgical procedures and recommending that his clinical privileges at Deaconess be revoked is guided by the Supreme Court decisions, which "establish two standards for antitrust immunity under *Parker v. Brown*. First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised' by the State itself." *California Liquor Dealers*, 445 U.S. at 105, 100 S.Ct. at 943 (quoting *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. at 410, 98 S.Ct. at 1135 (opinion of Brennan, J.)).

■ At the outset, we note the underlying rationale of *Parker* that "the state action doctrine is grounded in concepts of federalism and state sovereignty." *Hoover v. Ronwin*, 104 S.Ct. at 1998 n. 24 (citing *Community Communications Co. v. Boulder*, 455 U.S. at 54). Indeed, "the *Parker* exemption reflects the federalism principle that we are a Nation of *States*," *Community Communications Co. v. Boulder*, 455 U.S. at 50, 102 S.Ct. at 840 (emphasis original), and "under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority," *Parker*, 317 U.S. at 351, 63 S.Ct. at 313. This court's concern in resolving the state action issue is to preserve the principles of state sovereignty

---

**18.** To satisfy the "clearly articulated and affirmatively expressed state policy" element of the state action doctrine, the state legislature must authorize the challenged activity and the legislature must intend to displace the Federal antitrust laws. *See* P. Areeda, *Antitrust Law* ¶ 212.3 at 53 (Supp.1982). *See also Community Communications Co. v. Boulder*, 455 U.S. at 51–52, 102 S.Ct. at 840–841; *Lafayette v. Louisiana*

*Power & Light Co.*, 435 U.S. at 415, 98 S.Ct. at 1138 (opinion of Brennan, J.). The state legislature's intent to displace the federal antitrust laws exists if the challenged restraint is a necessary consequence of engaging in the authorized activity. P. Areeda, *Antitrust Law, supra,* at 54. *See also HyBud Equip. Corp. v. City of Akron,* 742 F.2d 949 at 959 (6th Cir.1984).

and federalism without disregarding the procompetitive, free enterprise values embodied in the Federal antitrust laws.[19] The presence of a clearly articulated and affirmatively expressed state policy, as well as active state supervision, reduces the "concern that federal policy is being unnecessarily and inappropriately subordinated to state policy." *Bates v. State Bar of Arizona*, 433 U.S. at 362, 97 S.Ct. at 2698. Moreover, the active supervision requirement "ensures that state-federal conflict will be avoided in those areas in which the state has demonstrated its commitment to a program through its exercise of regulatory oversight." 1 P. Areeda & D. Turner, *Antitrust Law* ¶ 213a at 73 (1978). We add that in the instant case, a further concern of this court is to promote the intended purpose of the Sherman Act as a "consumer welfare prescription." *NCAA v. Board of Regents of Univ. of Okla.*, — U.S. —, 104 S.Ct. 2948, 2964, 82 L.Ed.2d 70 (1984) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 343, 99 S.Ct. 2326, 2333, 60 L.Ed.2d 931 (1979)). *See also Indiana Federation of Dentists v. F.T.C.*, 745 F.2d 1124 at 1140 (1984); R. Bork, *The Antitrust Paradox* 66 (1978); 21 Cong.Rec. 2455, 2456–63 (March 21, 1890) (statement of Sen. Sherman). The State of Indiana has developed and enacted a comprehensive statutory scheme of medical peer review to protect consumer welfare. Indeed, the State's medical peer review process ensures Indiana citizens of the highest quality of medical care, while protecting them from incompetent, unqualified medical treatment. It is within this framework that we analyze the comprehensive statutory scheme developed and enacted by the Indiana legislature to establish, regulate, and supervise the medical peer review process within the State.[20]

Our initial inquiry is whether the defendants' review of Dr. Marrese's surgical "back" procedures at Deaconess and the recommendation that his clinical privileges be revoked is conduct "clearly articulated and affirmatively expressed as [Indiana] state policy." The Indiana statutory scheme clearly mandates that:

"The governing board of the hospital *shall* be the supreme authority in the hospital, responsible for ... the appointment of members of the medical staff and the assignment of privileges to members of the medical staff with the advice and recommendations of the medical staff consistent with their individual training, experience, and other qualifications. The medical staff of a hospital shall be an organized group which ... *shall* have the responsibility of reviewing the professional practices in the hospital for the purpose of reducing morbidity and mortality, and for the improvement of the care of patients in the hospital. This review shall include, but shall not be limited to, the quality and necessity of the care provided patients ...."

**19.** *See, e.g.,* S. Sachs, *Antitrust, The States, and The Professions,* 52 Antitrust L.J. 189, 191–92 (1983) (professional areas create a potential tension between Federal antitrust laws and states' legitimate interest in regulation); D. Smith, *Antitrust Immunity for State Action: A Functional Approach,* 31 Baylor L.R. 263, 289–92 (1979) (state action doctrine is an accommodation of potentially competing sovereigns).

**20.** In the instant case, our state action analysis is, by necessity, limited to a review of the Indiana statutory scheme regulating the medical peer review process. We note, however, that peer review is mandated by Congress when medical services are paid for with Medicare, *see* 42 U.S.C. § 1395x(k), (r), (s) (1982), and/or Medicaid, *see* 42 U.S.C. § 1396a(a)(19), (26) (1982), funds, and also when hospitals seek cer-

tification for participation in the Medicare program by obtaining accreditation from the Joint Commission for the Accreditation of Hospitals, *see* 42 U.S.C. § 1395bb(a) (1982). It is clear that Congress, by mandating hospital staff members or members of the local medical society to participate in the peer review process, *see* 42 U.S.C. § 1395x(k)(2), accepts the potential anticompetitive effects of the medical peer review process in favor of quality medical care. *See* 49 Fed. Reg. 14977 (1984) (proposed rules to protect information of Peer Review Organizations); 49 Fed.Reg. 29026 (1984) (revised rules for Peer Review Organizations). *Cf. Pontius v. Children's Hospital,* 552 F.Supp. at 1376 (Congress has attempted to improve the process of peer review through the Peer Review Improvement Act, 42 U.S.C. §§ 1320c–1 *et seq.* (1984)).

Ind.Code § 16–10–1–6.5 (emphasis added).[21] To implement this review process, the statutory scheme provides that hospitals establish a peer review committee that shall have "the responsibility of evaluation of qualifications of professional health care providers, or of patient care rendered by professional health care providers, or of the merits of a complaint against a professional health care provider that includes a determination or recommendation concerning the complaint." Ind.Code § 34–4–12.6–1. The peer review committee must be organized, *inter alia*, "by the professional staff of a hospital" and a "majority of the members [must be] professional health care providers holding licenses in the stated profession of the committee." *Id.*

The plaintiffs admit that Deaconess Hospital has "attempted to implement the provisions" of Ind.Code 34–4–12.6–1 *et seq.* Additionally, the plaintiffs allege that the SAHC and the Executive Council at Deaconess were organized by the hospital and consisted of a majority of licensed doctors (seven doctors, one hospital administrator, and one attorney). The record reveals that the medical staff at Deaconess Hospital has acted pursuant to Ind.Code § 34–4–12.-6–1, to establish a peer review process that complies with the requirements of Ind.Code § 34–4–12.6–1(c). The State of Indiana has "clearly articulated and affirmatively expressed as state policy" that hospital medical staffs are to form peer review committees and that such committees are to review the quality and necessity of the care provided patients, to evaluate the qualifications of staff members, and review the merits of any recommendation against a staff member. Ind.Code §§ 16–10–1–6.5, 34–4–12.6–1. As a necessary and reasonable consequence of this state mandated medical peer review process, hospital staff members must review the medical treatments, diagnostic procedures, and surgical procedures of competing staff members and, when required, recommend the revocation of staff privileges. Thus, the defendants' conduct, as members of or consultants to the hospital board, the SAHC, and the Medical Staff Executive Council, in reviewing Dr. Marrese's surgical procedures

---

21. Similarly, the administrative regulations of the Indiana Hospital Licensing Board provide that:

"THE GOVERNING BODY. The governing board of the hospital shall be the supreme authority in the hospital, responsible for the management, operation, functioning, and control of the hospital. The Governing Body shall:

\* \* \* \* \* \*

(g) Approve the bylaws, rules, and regulations of the Medical Staff and audit procedures or other measures used to assure quality of care.
(h) Appoint members of the Medical Staff and assign privileges consistent with their individual training, experience, and other qualifications on a periodic basis (at least every two (2) years) with the advice and recommendations of the organized Medical Staff."
410 Ind.Adm.Code 15–1–5 (Cumm.Supp.1983). Furthermore:

"THE MEDICAL STAFF. (1) The Medical Staff of a hospital composed of two (2) or more physicians shall be an organized group which shall be responsible to the governing board for the clinical and scientific work of the hospital, advise regarding professional matters and policies to the governing board, or the board's designee, and shall have the responsibility of reviewing the professional practices in the hospital for the purpose of reducing morbidity and mortality, and for the improvement of the care of patients in the hospital. This review shall include, but shall not be limited to, the quality and necessity of the care provided patients and the preventability of complications and deaths occurring in the hospital.

(2) The medical staff shall initiate and, with the approval of the Governing Body, adopt and periodically amend bylaws, rules, regulations, and policies which shall include, but need not be limited to, provisions for:
(a) Qualifications to be met for appointment to staff membership and for delineation of privileges.

\* \* \* \* \* \*

(d)(1) Review of applications for staff membership, delineation of privileges, and recommendations on appointment to the Governing Body.
(2) Appeal of decisions regarding Medical Staff membership and privileges.
(3) Review and analysis, at regular stated intervals, of clinical performance, pathological reports, the completeness of medical records and of the enforcement of requirements related thereto, of infection control, of use of blood and blood-related elements, and of total patient care.
410 Ind.Adm.Code 15–1–7 (Cumm.Supp.1983).

and recommending that his staff privileges be revoked, satisfies the first element of the *Parker* test. *See* Borsody & Tiano, *Peer Review and the Anti-Trust Laws: An Analysis and a Proposal*, 26 St. Louis U.L.J. 511, 514–15 (1982).

We turn our attention to the second element of the *Parker* test, whether the State of Indiana "actively supervises" the medical peer review process. The Indiana statutory scheme provides that the Indiana Medical Licensing Board shall, *inter alia*, promulgate rules and regulations necessary for the licensing of doctors within the state and also "[a]dopt rules establishing standards for the competent practice of medicine or osteopathic medicine, or any other form of practice regulated by a limited license or permit issued [by the Board]." Ind.Code § 25–22.5–2–7(h) (1982). The Medical Licensing Board, created by the Indiana legislature, consists of five physicians, one osteopathic physician, and one lay member of the general public, all appointed by the Governor. The Board closely supervises the Indiana medical profession by requiring that every physician within the state biennially register and qualify for licensure by the Board. 844 Ind.Adm. Code 4–6–1 *et seq.* (Cumm.Supp.1983). Pursuant to Ind.Code § 25–22.5–6–2.1, the Board is authorized to commence revocation proceedings to revoke or suspend the medical license of any practitioner who knowingly violates the rules of competent medical practice established and promulgated by the Board. In furtherance of this duty to regulate the Indiana medical profession, the Board reviews the communications, records, and determinations of hospital peer review committees. According to the Indiana statutory scheme:

"Communications to, and the records and determinations of, a peer review committee may only be disclosed to the specific

credentials committee of a hospital or other health facility, the disciplinary authority of the professional organization of which the professional health care provider under question is a member, or *the appropriate state board of registration and licensure* which the committee deems necessary for recommended disciplinary action . . . ."

Ind.Code § 34–4–12.6–2(b) (emphasis added).[22] Thus, the Indiana legislature has created the Indiana Medical Licensing Board as an official body of the State to promulgate and enforce standards of competent medical practice, regulate the licensing of doctors within the State, and review the confidential communications, records, and determinations of medical peer review committees. The examination of confidential peer review data and records is an essential element of the Board's function in regulating the medical profession and in assuring that the citizens of Indiana receive the highest quality of medical care.

In addition, the Indiana statutory scheme provides that the State Board of Health shall license and regulate hospitals within the state through the Hospital Licensing Council. Ind.Code §§ 16–10–1–1, 16–10–1–3. Pursuant to Ind.Code § 16–10–1–12, the Council shall promulgate rules and regulations pertaining to the proper operation and management of hospitals within the State, amend rules and regulations "for the establishment and maintenance of standards of hospitalization required for the efficient care of patients," and prescribe, through rules and regulations, "the minimum standards as to equipment and provision for the care of patients to which an institution must conform in order to operate lawfully as a hospital" within the State. The Hospital Licensing Council, just as the Medical Licensing Board, is a creature of the Indi-

---

**22.** Similarly, the Indiana legislature amended Ind.Code § 16–10–1–6.5, effective April 22, 1983, to require that:

"The governing board shall report, in writing, to the Indiana medical licensing board the results and circumstances of any final, substantive, and adverse disciplinary action taken by the governing board regarding a

physician on the medical staff, or an applicant for the medical staff, if the action results in voluntary or involuntary resignation, termination, nonappointment, revocation, or significant reduction of clinical privileges or staff membership."

Ind.Code Ann. § 16–10–1–6.5(b) (Burns Supp. 1983).

ana legislature and consists of one physician, one registered nurse, four hospital administrators, one member of the Indiana Department of Public Welfare, and one member of the State Board of Health, all appointed by the Governor. Ind.Code § 16–10–1–3. The Council continually reviews the operation of hospitals within the State and, based upon its compiled data, recommends to the State Board of Health whether or not a hospital qualifies for annual license renewal. Ind.Code § 16–10–1–9. According to the Indiana statutory scheme, representatives of the State Board of Health are required to review all hospitals within the state on a periodic basis, Ind.Code § 16–10–1–13, and the Hospital Licensing Council is authorized to employ field inspectors to inspect hospitals and "give advice, aid, and encouragement to such institutions, in maintaining high professional ideals and good care of patients." Ind.Code § 16–10–1–17. Pursuant to 410 Ind.Adm.Code 15–1–8(1)(c) (1979), these field inspectors are entitled to review the confidential minutes of meetings of the hospital board, the medical staff, and the medical staff peer review committees. Included within the confidential minutes of peer review meetings are records of staff membership applications, delineations of staff privileges, appeals of decisions regarding medical staff membership and privileges, and records of clinical performance and total patient care within the hospital. 410 Ind.Adm.Code 15–1–7(d), (f). Thus, the Hospital Licensing Council of the Indiana State Board of Health is an official body created by the Indiana legislature to promulgate and enforce the proper standards of hospital care and regulate the licensing and operation of hospitals within the State. As an integral part of its hospital inspection program, the Council reviews the confidential communications, records, and determinations of medical peer review committees, assuring Indiana citizens that hospital medical staffs are providing quality medical care while acting in accordance with approved medical standards.

In *California Liquor Dealers*, the Supreme Court analyzed the nature of the supervision that a state must exercise over a nonsovereign state representative to satisfy the second element of the *Parker* test. In that case the State of California had a plan for wine pricing that constituted resale price maintenance in violation of the Sherman Act. The defendant, a wholesaler of California wines, argued that his enforcement of the wine pricing system was exempt from the Federal antitrust laws under the doctrine of state action. The Supreme Court held that the resale plan was "clearly articulated and affirmatively expressed as state policy" because "[t]he legislative policy is forthrightly stated and clear in its purpose to permit resale price maintenance." *California Liquor Dealers*, 445 U.S. at 105, 100 S.Ct. at 943. The Court added, however, that the plan "does not meet the second requirement for *Parker* immunity. The State simply authorizes price setting and enforces the prices established by private parties. The State neither establishes prices nor reviews the reasonableness of the price schedules; nor does it regulate the terms of fair trade contracts." *Id.* at 105–06, 100 S.Ct. at 943–44.

As contrasted to the facts in *California Liquor Dealers*, the State of Indiana, through the Indiana Medical Licensing Board, enacts, promulgates, and enforces rules of competent medical practice within the State and reviews the confidential records of medical peer review committees to determine if further action is required. This Medical Licensing Board, acting on behalf of the State's interest in protecting the health and ensuring the safety of Indiana citizens, closely supervises the Indiana medical profession and with the assistance of medical peer review committees, regulates the licensing of physicians within the State. Moreover, the State of Indiana, through the Hospital Licensing Council, promulgates standards of proper hospital care, regulates the licensing of hospitals within the State, and, as an integral part of its hospital inspection program, reviews the confidential records of medical peer review committees. In light of the Medical Licens-

ing Board's active supervision of the medical profession and the Hospital Licensing Council's active supervision of hospitals and their medical staffs, it is clear that the State of Indiana ensures its citizens of quality medical care and "actively supervises" the medical peer review process within the State. Thus, the defendants' conduct, as members of or consultants to the hospital board, the SAHC, and the Medical Staff Executive Council, in reviewing Dr. Marrese's surgical procedures and recommending that his staff privileges be revoked satisfies the second element of the *Parker* test.

Furthermore, the Indiana statutory scheme provides that:

"The members of any medical staff committee organized for the purpose of conducting medical review, being retrospective and not a part of current patient care, shall have an absolute immunity from civil liability for communications made in committee meetings, and reports and recommendations made by the committee arising from deliberations by the committee to the governing board of the hospital or another duly authorized medical staff committee."

Ind.Code § 16–10–1–6.5.[23] Similarly, Ind. Code. § 34–4–12.6–3 provides that:

"There shall be no liability on the part of, and no action of any nature shall arise against, the personnel of a peer review committee for any act, statement made in the confines of the committee, or proceeding thereof made in good faith in regard to evaluation of patient care

\* \* \* \* \* \*

The personnel of a peer review committee shall be immune from any civil action arising from any determination made in good faith in regard to evaluation of patient care . . . ."

This immunity from civil liability afforded members of the medical peer review process is in accord with the court's reasoning in *Pontius v. Children's Hospital*, that subjecting members of the peer review process to a Federal antitrust lawsuit will "chill the rights and obligations of physicians to participate in peer review." 552 F.Supp. at 1376. According to that court:

"if *individual physicians*, who manage to overcome their traditional reluctance to testify about the professional conduct of a colleague, know that by so doing they risk incurring legal fees running into six figures and a trial of a duration measured in months, on the mere allegation that they have conspired to restrain trade, the discovery of incompetent physicians will be rendered extraordinarily difficult."

*Id.* at 1362 (emphasis original).

It is only logical that physicians within the State of Indiana, when presented with allegations of Federal antitrust violations and the threat of treble damages, will either dilute their peer review reports and cease recommending the revocation of a hospital staff member's privileges or will discontinue their participation in the state mandated and supervised peer review process. As a result, the very lifeline of the medical peer review process will be severed. Indeed, as the Supreme Court observed in *Hoover v. Ronwin*, with regard to the legal profession and a committee of State Bar Examiners, "[t]here can be no question that the threat of being sued for [treble] damages [under the Sherman Act] particularly where the issue turns on subjective intent or motive—will deter 'able citizens' from performing [an] essential public service." 104 S.Ct. at 2002 n. 34. Similarly in the medical profession, the threat of a Federal antitrust lawsuit will compel able and qualified physicians, with particular expertise in complex areas of

---

**23.** The Indiana legislature amended § 16–10–1–6.5, effective April 22, 1983, to provide that: "The governing board and its employees, agents, consultants, and attorneys have absolute immunity from civil liability for communications, discussions, actions taken, and reports made concerning disciplinary action or investigation taken or contemplated, if such reports or actions are made in good faith and without malice."
Ind.Code Ann. § 16–10–1–6.5 (Burns Supp. 1983).

medicine, to abdicate their participation in the medical peer review process. The overall effect will be to destroy the intended purpose of medical peer review; to assure Indiana citizens of quality medical care and protect them from incompetent, unqualified medical treatment.

In the context of an academic setting this court recently stated that:

"the peer review process is essential to the very lifeblood and heartbeat of academic excellence and plays a most vital role in the proper and efficient functioning of our nation's colleges and universities. The process of peer evaluation has evolved as the best and most reliable method of promoting academic excellence and freedom by assuring that faculty tenure decisions will be made objectively on the basis of frank and unrestrained critiques and discussions of a candidate's academic qualifications."

*E.E.O.C. v. University of Notre Dame Du Lac*, 715 F.2d 331, 336 (7th Cir.1983). So too, peer review is essential to the very lifeblood and heartbeat of medical competency and quality medical care in the State of Indiana and throughout the nation. In furtherance of this policy, the Indiana statutory scheme provides that "a committee having the responsibility of evaluation of qualifications of professional health care providers, or of patient care rendered by professional health care providers, or of the merits of a complaint against a professional health care provider" shall be immune from any civil action arising from a determination made in good faith. Ind. Code· §§ 34-4-12.6-1, 34-4-12.6-3. Though this immunity attaches only after a finding that the committee's determinations were made in good faith, the concept to be gleaned from Ind.Code §§ 16-10-1-6.5 *et seq.*, 34-4-12.6-1 *et seq.* is that the State of Indiana realizes the real threat of lawsuits arising from the revocation of hospital staff privileges and has acted to protect the personnel involved in the medical peer review process. This protection encourages competent and qualified physicians to participate in the medical peer review process, thus assuring the citizens of Indiana that hospital medical staffs are competent,

qualified, and practicing in accord with approved medical standards. The "good faith" immunity provision is an essential element of the state mandated and supervised peer review process in the State and, in conjunction with the other provisions of the comprehensive statutory scheme, it furthers the underlying policy of the Sherman Act to protect consumer welfare.

We further note that under the Indiana statutory scheme any practitioner investigated by a medical peer review committee shall receive the due process safeguard of an evidentiary hearing before any disclosure of the committee's findings. Pursuant to Ind.Code § 34-4-12.6-2:

"Any professional health care provider under investigation shall be permitted at any time to see any records accumulated by a peer review committee pertaining to his personal practice and shall be offered the opportunity to appear before the peer review committee with adequate representation to hear all charges and findings concerning his practice and to offer rebuttal information, which shall be a part of the record before any disclosure of the charges and findings...."

According to the Fair Hearing Plan at Deaconess, any practitioner adversely affected by a recommendation of the Medical Staff Executive Council has a right to an evidentiary hearing and, if necessary, a review before the joint conference committee of the hospital. The practitioner may request to be represented by an attorney and/or be accompanied by a member of the medical staff. In addition he shall be allowed to introduce evidence, examine witnesses, and be on record throughout the entire hearing process. Moreover, if the hospital board, upon completion of the hospital hearings, adopts the Medical Staff Executive Council's recommendation of suspension or revocation, the practitioner may appeal that final decision, challenge the hospital staff members' "good faith" in reaching that decision, and challenge the Fair Hearing Plan on constitutional grounds, through the Indiana state court system. *See Kiracofe v. Reid Memorial Hosp.*, Ind.App., 461 N.E.2d at 1139–41; *Yarnell v. Sisters of St. Francis Hlth. Serv.*, Ind.App., 446

N.E.2d at 361–63. *See also, Renforth v. Fayette Memorial Hospital Ass'n.,* 178 Ind.App. 475, 489, 383 N.E.2d 368, 377 (1978) (en banc), *cert. denied,* 444 U.S. 930, 100 S.Ct. 273, 62 L.Ed.2d 187 (1979). In the instant case, it is clear that before his clinical privileges at Deaconess hospital are revoked, Dr. Marrese is entitled to the due process safeguards of a hearing and a review before the joint conference committee of the hospital. In the event that the hospital board adopts the recommendation of the Medical Staff Executive Council and revokes Dr. Marrese's clinical privileges, he is entitled to a complete review of that decision and all its proceedings within the Indiana state court system.

In light of the hearings provided by the Fair Hearing Plan at Deaconess, and the availability of the Indiana state courts to appeal an adverse decision of the hospital board, it is clear that the plaintiffs have a more than adequate forum to challenge the defendants' conduct and motives in reviewing Dr. Marrese's surgical procedures and in recommending that his clinical privileges at Deaconess be revoked. The plaintiffs' Federal antitrust lawsuit, attacking the defendants' conduct as members of the peer review process at Deaconess and challenging their motives in recommending that Dr. Marrese's clinical privileges be revoked, circumvents the hospital hearings and the state court review process in favor of a Federal forum. It is well recognized that "federal courts ... are now straining under excessive caseloads." *Patsy v. Florida Board of Regents,* 457 U.S. 496, 517, 102 S.Ct. 2557, 2568, 73 L.Ed.2d 172 (1982) (O'Connor, J., concurring). As a matter of judicial economy,[24] the Federal courts must not be further burdened by complex antitrust litigation when the alleged illegal conduct is mandated and supervised by the state and, furthermore, the plaintiff is afforded the due process safeguards of hearings and state court review. Common sense dictates that a cause of action under

the Sherman Act is not created every time a lawyer, accountant, or architect is denied partnership status in a national firm, a business executive is fired or denied a promotion by a national corporation, or a physician, surgeon, or specialist has hospital staff privileges denied or revoked. In the instant case, Dr. Marrese is entitled to challenge the defendants' motives and conduct in a hearing before the Deaconess medical staff, a review hearing before the joint conference committee of the hospital, and finally through proceedings in the Indiana state court system. Just as a disgruntled state bar applicant who is denied admission to a state bar has no cause of action under the Sherman Act against a state mandated and supervised bar review committee, *Hoover v. Ronwin,* 104 S.Ct. at 2001, Dr. Marrese has no cause of action under the Sherman Act against the defendants as participants in the state mandated and supervised medical peer review process. Instead, Dr. Marrese must challenge the defendants' conduct and motives through proper forums; the hospital hearing committees and the Indiana state court system.

Finally, we note the proviso of the court in *Pontius v. Children's Hospital,* that:

"If a physician, terminated from hospital privileges after receiving due process, is able to force the hospital to assume the burdens of an antitrust trial on the mere allegation that the hospital's decision was grounded on reasons violative of the Sherman Act, the ability of hospitals to regulate their medical staffs will be seriously impaired."

552 F.Supp. at 1362. The evident trend among an increasing number of state supreme courts is to find that a hospital's "failure to investigate a medical staff applicant's qualifications for the privileges requested gives rise to a foreseeable risk of unreasonable harm and [thus] a hospital has a duty to exercise due care in the selection of its medical staff." *Johnson v. Misericordia Community Hosp.,* 99

---

**24.** We here note Judge Fairchild's separate view that judicial economy is irrelevant in this context. As he sees it, our decision is an interpretation of the state action doctrine of Federal antitrust law. Our conclusion that the doctrine applies to the present situation does, of course, result in relieving the district court of this lawsuit, but in his view achievement of that result is not an appropriate consideration in reaching our conclusion.

Wis.2d 708, 723, 301 N.W.2d 156, 164 (1981) and cases cited therein. *See also Vuciecevic v. MacNeal Memorial Hosp.*, 572 F.Supp. 1424, 1428 (N.D.Ill.1983); Annot., 51 A.L.R.3d 981 (1973). Indeed, according to the court in *Johnson v. Misericordia Community Hosp.*:

" 'One of the hospital's primary functions is to screen its staff of physicians to "insure" that only competent physicians are allowed to practice in the hospital.'

\* \* \* \* \* \*

Obviously, the promotion of quality care and treatment of patients requires hospitals to perform a thorough evaluation of medical staff applicants from the standpoint of professional competence, ethics, established reputation, and further, to periodically review the qualifications of its staff through a peer review or medical audit mechanism. Hospitals, like doctors, must, above all else, be concerned with the welfare of their patients and must establish basic procedures to prevent subjecting them to harm and injury by physicians and surgeons who fail to possess an adequate level of technical skill, competence and ethical principles."

99 Wis.2d at 732, 734–35, 301 N.W.2d at 168–70 (quoting *Ferguson v. Gonyaw*, 64 Mich.App. 685, 697, 236 N.W.2d 543, 550 (1976)). *Cf. Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, — U.S. —, 104 S.Ct. 1551, 1568, 80 L.Ed.2d 2 (1984) ("hospital's unquestioned right to exercise some control over the identity and the number of doctors to whom it accords staff privileges").

█ In the instant case, the State of Indiana's comprehensive statutory scheme, mandating and supervising the medical peer review process, enables the hospitals to fulfill their common law duty of exercising due care in selecting and maintaining a qualified and competent medical staff and, as a result, assures Indiana citizens that medical practices and procedures within the State are being closely monitored and reviewed. An attack upon this state mandated and supervised peer review process, through the Federal antitrust laws, will compel able and qualified physicians to ab-

dicate their participation in the review of hospital staff members. This, in turn, will destroy the medical peer review process and prevent hospitals from fulfilling their duty to provide patients with a competent medical staff. In addition, the expenses in time and money, incurred by hospitals and physicians in defending their actions, as members of the state mandated and supervised medical peer review process, against the Federal antitrust laws, will eventually be reflected in increased medical costs to the consumer. Accordingly, we are reluctant to further burden the Federal courts with a greater influx of complex antitrust litigation, when a state such as Indiana in the instant case, clearly articulates and affirmatively expresses a state policy mandating medical peer review; actively supervises peer review committees' communications, records, and determinations through the Medical Council; enacts legislation to assure an adversely affected practitioner that he will receive the due process safeguard of an evidentiary hearing within the hospital; and provides the adversely affected practitioner with a state court forum to challenge the conduct and motives of participants in the peer review process.

█ Based upon the foregoing analysis it is apparent that the State of Indiana has established a thorough peer review process to assure the citizens of Indiana that only competent and qualified physicians, who practice only approved methods of medical care, are licensed within the state. True, the members of a peer review committee, as trained experts in highly specialized fields of medicine, are often in direct competition with the practitioner whom they are reviewing, and the committee's decision to revoke hospital staff privileges may conceivably have a "substantial and adverse effect" upon interstate commerce. Nonetheless, "we are a Nation of *States* " *Community Communications Co. v. Boulder*, 455 U.S. at 50, 102 S.Ct. at 840 (emphasis original), and "under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority," *Parker*, 317 U.S. at 351, 63 S.Ct. at 313. "The Sherman Act ... gives no hint that it was intended to restrain ...

official action directed by a state." *Parker*, 317 U.S. at 351, 63 S.Ct. at 313. There is "nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or [its nonsovereign representatives] from activities directed by its legislature." *Id.* at 350–51, 63 S.Ct. at 313–14. In fact, the purpose of the Sherman Act is to protect consumer welfare.

The State of Indiana has made a policy decision that the peer review process is necessary to protect the citizens of Indiana and promote consumer welfare. It runs contrary to the very concepts of state sovereignty and federalism for a Federal court to review the conduct of a peer review committee, under the guise of the Sherman Act, when the State of Indiana: mandates that hospital medical staffs review the quality and necessity of care provided patients; establishes a peer review process to assure for a competent medical staff throughout the State; immunizes members of a peer review committee, who act in good faith, from civil liability; creates a Medical Licensing Board and a Hospital Licensing Council to enforce rules of medical competence and review the actions of medical peer review committees; provides adversely affected practitioners with the due process safeguards of an evidentiary hearing; and provides adversely affected practitioners with a state court forum to challenge the conduct and motives of participants in the peer review process. In the instant case, the defendants' actions in reviewing Dr. Marrese's surgical procedures and in recommending that his clinical privileges be revoked are "clearly articulated and affirmatively expressed as state policy" and are "actively supervised" by the State. Thus, in light of the plaintiffs' allegations that the defendants alleged illegal conduct consists solely of their actions as members of or consultants to the hospital board, the SAHC, and the Medical Staff Executive Council, acting within the Indiana medical peer review process, we hold that the defendants' actions are exempt from the Federal antitrust laws under the doctrine of state action.[25]

## III

Accordingly, we affirm the district court's dismissal of the plaintiffs' complaint.

---

25. We are cognizant of the district court's ruling that the plaintiffs did not allege sufficient "state action" to state a cause of action under 42 U.S.C. § 1983. The plaintiffs did not appeal the district court's dismissal of their claim under 42 U.S.C. § 1983 nor was this court presented with any argument on the issue. We note that the elements required for a cause of action under 42 U.S.C. § 1983, a "deprivation ... caused by the exercise of some right or privilege created by the State" and "the party charged with the deprivation must be a person who may fairly be said to be a state actor," *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 2754, 73 L.Ed.2d 482 (1982) differ from the elements required for state action under *Parker*. We further note that the Fair Hearing Plan at Deaconess Hospital provides Dr. Marrese with the due process safeguard of an evidentiary hearing and, if necessary, a review hearing before the joint conference committee of the hospital. Moreover, if Dr. Maresse's clinical privileges at Deaconess are, in fact, revoked, the hospital's decision can be appealed through the Indiana state court system.