Edward F. QUINN, III, Plaintiff,

v.

KENT GENERAL HOSPITAL, INC., a Delaware corporation, Dennis E. Klima, James R. Reber, James B. McClements, M.D., T. Noble Jarrell, M.D., J. Robert Fox, M.D., and John C. Sewell, M.D., Defendants.

Civ. A. No. 84–509 CMW.

United States District Court, D. Delaware.

Aug. 16, 1985.

William J. Wier, Jr., and Joseph G. Krauss, of Herlihy & Wier, Wilmington, Del., for plaintiff.

Myron T. Steele, of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del., and John R. Williams, of Prickett, Jones, Elliott, Kristol & Schnee, Dover, Del., for defendants.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

This case was brought by Dr. Edward F. Quinn, III, after Kent General Hospital refused to admit him to its active medical staff. Dr. Quinn is an orthopedic surgeon with offices in Dover, Milford and Georgetown, Delaware. The defendant Kent General Hospital, Inc. (the "Hospital"), is a non-profit corporation organized under the laws of the State of Delaware and operates a facility at 640 South State Street, in Dover, Delaware, for the purpose of providing patient care, education and research. Individual defendants Dr. James B. McClements, Dr. T. Noble Jarrell, Dr. J. Robert Fox and Dr. John C. Sewell are engaged in the practice of medicine in the Dover, Delaware area and are members of the active medical staff of the Hospital. Individual defendants Dennis E. Klima and James P. Reber are the executive director and the associate executive director of the Hospital, respectively.

Dr. Quinn asserts that the Hospital's refusal to grant him active staff privileges gives rise to a variety of civil rights, antitrust and pendent state law claims, and that injunctive relief admitting him to the Hospital's active medical staff, as well as compensatory and punitive damages are appropriate. The case is now before the Court on the defendants' motions for summary judgment and a discovery protective order.

## I. FACTUAL BACKGROUND

Under the Hospital's medical staff by-laws, there are five categories of appointment, with varying duties and privileges, to

the Hospital's medical staff. However, only physicians appointed to the active medical staff or the provisional active medical staff may admit patients to the Hospital. The bylaws further provide that all initial applicants to the active medical staff must serve a minimum twelve month period on the provisional active staff before they can be recommended for admission to the active staff. In accordance with this provision, on or about September 15, 1980, Dr. Quinn applied to the Hospital for appointment to the provisional active staff. This application was amended, at the request of Dr. McClements, so that the request was for appointment to the consulting medical staff rather than to the provisional active staff. The reason for this request was that, in Dr. McClement's opinion, the application for provisional active staff privileges would not be approved, on the ground that Dr. Quinn did not satisfy article II, part A of the Hospital's bylaws, which requires that a physician on the active medical staff "reside within reasonable distance of the Hospital." After it was so amended, the Hospital's board of directors recommended approval of Dr. Quinn's application, and Dr. Quinn was appointed to the consulting staff on March 2, 1981.

By letter of May 4, 1981, Dr. Quinn advised Dennis E. Klima, the executive director of the Hospital, that he intended to apply for admission to the active medical staff. In his letter, Dr. Quinn informed Mr. Klima that the medical group of which he was a member had purchased a building adjacent to the Hospital to be used as an orthopedic clinic with resident facilities. By letter of May 5, 1981, Dr. Quinn formally requested the Hospital to change his status from that of consulting staff member to active staff member. He also advised Mr. Klima that there was no orthopedic emergency that would require a reaction time of less than 30 minutes and that the clinical facilities he and his associates had purchased adjacent to the Hospital could be used, if necessary, to follow a patient with an acute course.

By letter of July 16, 1981, Mr. Klima informed Dr. Quinn that the executive committee of the Hospital's medical staff had recommended that his application for admission to the provisional active staff be denied. Mr. Klima advised Dr. Quinn that his application had been denied because of the distance between Dr. Quinn's primary residence and primary office and the Hospital. The statement of grounds and specifications supporting the recommendation of the executive committee stated that the Hospital bylaw requiring admitting physicians to "reside within a reasonable distance of the hospital" had been "consistently construed in the past" to mean that physicians on the active medical staff reside within a 10 to 15 mile radius of the Hospital, and that Dr. Quinn's principal residence was approximately 25 miles from the Hospital. The executive committee also referred to a federal regulation governing the conditions under which federal aid is available to hospitals as supporting its decision. The regulation, 42 C.F.R. § 405.1021(h)(2), provides that "[a] member of the house staff or other physician" be "on duty or on call at all times and available within 15 or 20 minutes at the most."

The Hospital's bylaws provide for two levels of review of adverse decisions by the executive committee regarding admission to staff privileges, and Dr. Quinn availed himself of the full extent of these appeals. On August 31, 1981, a hearing panel was convened pursuant to article VIII of the medical staff bylaws. The hearing panel concluded that the decision of the executive committee was correct in denying Dr. Quinn's application for failure to meet the distance requirement set out in article II, part A of the bylaws. In accordance with the bylaws, Dr. Quinn then requested an appellate review of the hearing panel's decision and report. The review panel convened on November 19, 1981 and found that the action of the hearing panel had not been taken "arbitrarily, capriciously or with prejudice" and that the evidence submitted supported the action of the committee. One member of the review panel dissented as to the majority's interpretation of the distance requirement contained in the

bylaws. With this decision, Dr. Quinn exhausted all administrative remedies available to him under the Hospital's bylaws. On September 12, 1984, he filed the complaint in this case.

## II. SUMMARY JUDGMENT: The Civil Rights Causes of Action

Dr. Quinn's complaint alleges that the action of the Hospital in denying him active staff privileges has deprived him of certain rights guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution, and by sections 1981, 1982, 1983 and 1985 of the United States Code, specifically:

"(a) The right not to be deprived of life, liberty or property without due process of law. The aforementioned bylaw requirement has been arbitrarily and capriciously applied by the defendant Hospital against the plaintiff in that other physicians who reside outside of the 10 to 15 mile radius of Kent General Hospital have been accorded admission to the Active Medical Staff. This arbitrary and capricious enforcement of the bylaw against the plaintiff constitutes a breach of procedural due process.

(b) The right to equal protection of the laws. The application of the aforementioned bylaw as to the plaintiff arbitrarily and capriciously discriminates against the plaintiff and other physicians like him who are denied active staff privilege at Kent General Hospital solely due to the location of their residence outside the City limits of Dover.

(c) The right to equal protection of the laws. The application of the aforementioned bylaw as to the plaintiff arbitrarily and capriciously discriminates against the plaintiff and other physicians like him in that this bylaw is not applied to require that other medical personnel who are needed in emergency situations reside within a 10 to 15 mile radius of Kent General Hospital."

It is well established that 42 U.S.C. §§ 1981 [1] and 1982 [2] provide causes of action only for discrimination based upon race or alienage. See Georgia v. Rachel, 384 U.S. 780, 788–92, 86 S.Ct. 1783, 1788–89, 16 L.Ed.2d 925 (1966); Takahashi v. Fish & Game Commission, 334 U.S. 410, 419–20, 68 S.Ct. 1138, 1142–43, 92 L.Ed. 1478 (1948); Glover v. Tower, 700 F.2d 556 (9th Cir.1983), aff'd., — U.S. ——, 104 S.Ct. 2820, 81 L.Ed.2d 758 (1984); Bell v. Brennan, 570 F.Supp. 1116, 1118 (E.D.Pa.1983); Rackin v. University of Pennsylvania, 386 F.Supp. 992, 1008–09 (E.D.Pa.1974). Since Dr. Quinn has not made any allegations that the Hospital or its staff discriminated against him because of his race or alienage, the complaint fails to state a cause of action under 42 U.S.C. §§ 1981 or 1982, and summary judgment will be granted for the defendants as to these claims.

Dr. Quinn has also stated a claim under 42 U.S.C. § 1983.[3] While it has long been settled that section 1983 requires an element of state action or state involvement in the alleged deprivation of constitutional rights, privileges or immunities, the

---

**1.** 42 U.S.C. § 1981 provides:

"All persons within the jurisdicition of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

**2.** 42 U.S.C. § 1982 provides:

"All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by White citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

**3.** 42 U.S.C. § 1983 provides in relevant part:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other property proceeding for redress ...".

precise nature and scope of the state action requirement has been the subject of ongoing judicial elaboration. *See Civil Rights Cases*, 109 U.S. 3, 11–14, 3 S.Ct. 18, 21–24, 27 L.Ed. 835 (1883); *Shelley v. Kraemer*, 334 U.S. 1, 13–23, 68 S.Ct. 836, 842–47, 92 L.Ed. 1161 (1948); *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 721–26, 81 S.Ct. 856, 859–62, 6 L.Ed.2d 45 (1961); *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 171–179, 92 S.Ct. 1965, 1970–1974, 32 L.Ed.2d 627 (1972); *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351–59, 95 S.Ct. 449, 453–58, 42 L.Ed.2d 477 (1974). Dr. Quinn asserts that the Hospital's decision not to admit him to active staff privileges was state action in the instant case, because the Hospital is a "public entity." In support of this assertion, Dr. Quinn argues that, although Kent General Hospital is not owned or operated by the State of Delaware, it is nevertheless dedicated to a public use, receives funding from public sources, receives tax benefits associated with its public function, has a monopoly of hospital facilities in the Dover area and is regulated by the state.

Prior to the Supreme Court's decision in *Jackson v. Metropolitan Edison Co., supra*, there was a split of authority in the Third Circuit as to whether the actions of a private hospital with the attributes alleged by Dr. Quinn could be state action for purposes of section 1983. *Compare Citta v. Delaware Valley Hospital*, 313 F.Supp. 301 (E.D.Pa.1970) (state action requirement satisfied where hospital received state-administered federal Hill-Burton funds for hospital construction) *with Ozlu v. Lock Haven Hospital*, 369 F.Supp. 285 (M.D.Pa. 1974) (no state action even though hospital received state administered Hill-Burton funds).[4] In *Jackson v. Metropolitan Edison Co.*, a woman brought suit against a privately owned and operated utility company under section 1983 for disconnecting her electricity service without affording her notice and an opportunity for a hearing. Although the utility company was subject to extensive state regulation, the Supreme Court stated that "[t]he mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment. . . . [T]he inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." 419 U.S. at 350–51, 95 S.Ct. at 453–54.

■ Following *Jackson*, courts in the Third Circuit have declined to find state action by private hospitals in circumstances similar to those alleged by Dr. Quinn. In *Hodge v. Paoli Memorial Hospital*, 576 F.2d 563 (3d Cir.1978), for example, Hodge brought suit under section 1983 when the defendant hospital terminated his staff privileges and office lease. Hodge argued that the hospital's tax-exempt status and its receipt of Hill-Burton funds and other state benefits showed that its decision to terminate his privileges was state action

---

**4.** There was also a split of authority among the circuits. *See, e.g., Sams v. Ohio Valley Gen'l Hosp. Ass'n*, 413 F.2d 826 (4th Cir.1969) (receipt of Hill-Burton funds meant hospital acted under color of state law); *Simkins v. Moses H. Cone Mem. Hosp.*, 323 F.2d 959 (4th Cir.1963) (same); *Doe v. Bellin Mem. Hosp.*, 479 F.2d 756 (7th Cir.1973) (receipt of Hill-Burton funds did not mean hospital's actions and policies carried out under color of state law); *Barrett v. United Hosp.*, 376 F.Supp. 791 (S.D.N.Y.1974) (same).

The decision in *Simkins* and the cases following it relied on *Burton v. Wilmington Parking Authority, supra*, where the Supreme Court held that racial discrimination by a restaurant that leased premises in a municipally owned and operated parking garage was state action for

purposes of the Fourteenth Amendment. The *Burton* court found that, considering the totality of the circumstances, including the mutual benefits conferred and received and the fact that the restaurant was located in a public building operated by the city for a public purpose, the state had so far insinuated itself into the operations of the restaurant as to become a joint participant in its discriminatory practices. *Id.* 365 U.S. at 725, 81 S.Ct. at 861. It was not until *Moose Lodge* and *Jackson*, however, that the Supreme Court considered the question of whether state regulation of a private activity confers upon it the status of state action, a question more directly relevant to the activities of private hospitals than the issue considered in *Burton*.

for purposes of section 1983. The Third Circuit disagreed and stated that "the receipt of Hill-Burton construction funding, Medicare and Medicaid funds, and the existence of tax exemption, as well as state licensing requirements for non-profit hospitals, do not constitute state action under 42 U.S.C. § 1983." *Id.* at 564. *Accord Holton v. Crozer-Chester Medical Center,* 419 F.Supp. 334 (E.D.Pa.1976), *vacated on other grounds,* 560 F.2d 575 (3d Cir.1977); *Sament v. Hahnemann Medical College & Hospital,* 413 F.Supp. 434 (E.D.Pa.1976); *Acosta v. Tyrone Hospital,* 410 F.Supp. 1275 (W.D.Pa.1976). Thus, Dr. Quinn's argument that Kent General Hospital's decision not to admit him to active staff privileges was state action because the Hospital is dedicated to a public use, is subject to state regulation and receives tax benefits and public funding is contradicted by the applicable cases in the Third Circuit.[5]

As for the argument that the Hospital's alleged monopoly of hospital facilities in the area transforms its decision into state action, this argument was explicitly rejected by the Supreme Court in *Jackson v. Metropolitan Edison Co., supra,* 419 U.S. at 351–52, 95 S.Ct. at 453–54. Dr. Quinn also maintains that the Hospital's reliance on a federal regulation governing the conditions under which hospitals may receive federal aid to justify its decision shows that the state action requirement has been met. It is well established, however, that "[s]ection 1983 provides no cause of action against federal officers or private individuals acting under color of federal law." *Betlyon v. Shy,* 573 F.Supp. 1402, 1407 (D.Del.1983). *See District of Columbia v. Carter,* 409 U.S. 418, 423–25, 93 S.Ct. 602, 605–07, 34 L.Ed.2d 613 (1973); *Campbell v. Amax Coal Co.,* 610 F.2d 701, 702 (10th Cir.1979); *Bethea v. Reid,* 445 F.2d 1163, 1164 (3d Cir.1971).

■■■ There is another possible basis for a finding of state action under section 1983 that has not been argued by Dr. Quinn. This is the Delaware medical peer review statute. 24 *Del.C.* § 1768 confers immunity upon the good faith actions of members of medical peer review committees "whose function is the review of medical records, medical care and physicians' work, with a view to the quality of care and utilization of hospital or nursing home facilities ...", and exempts the records and proceedings of such committees from discovery. The question is whether this statute, which is intended to promote and encourage the medical peer review process with an ultimate view towards improving the quality of medical care in Delaware, creates a sufficiently close nexus between the activities of the Hospital's credentials committee and the state that the actions of the committee may be reasonably attributed to the state.

The members of the credentials committee are neither state officials nor appointed by the state, nor does the state exercise any oversight over the committee apart from the general review of all hospital activities by the Board of Health that is part of the hospital accreditation process. As the Court has pointed out, the mere existence of such state regulation does not transform the regulated activity into state action for purposes of section 1983. The Delaware peer review statute is intended to encourage the frank and open discussion of physicians' qualification and performance by medical peer review committees, but it does not involve the State of Delaware itself in the deliberations of these committees. In promoting the work of peer review committees, the peer review statute is not unlike the subsidies and tax benefits the state also provides for hospitals. All are designed to create favorable incentives for private hospitals to engage in activities that benefit the public at large by improving the quality of medical care. And just as neither state administered subsidies nor tax benefits granted by the state confer

---

**5.** In the wake of *Jackson,* the Fourth Circuit has also decided not to follow its earlier cases holding that receipt of Hill-Burton funds brings private hospitals within the ambit of the state action requirement. *See Modaber v. Culpeper Mem. Hosp., Inc.,* 674 F.2d 1023, 1025–26 (4th Cir.1982) (holding earlier cases inconsistent with *Jackson* ).

upon the activities of a private hospital the status of state action for purposes of section 1983, neither does the encouragement of the peer review process provided by 24 *Del.C.* § 1768. The Court concludes that there are no allegations that could support a finding of state action under 42 U.S.C. § 1983, and summary judgment will be granted for the defendants on the section 1983 cause of action.

■ Finally, Dr. Quinn has asserted a civil rights claim under 42 U.S.C. § 1985.[6] Unlike section 1983, section 1985(3) does not have a state action requirement. *See Griffin v. Breckenridge*, 403 U.S. 88, 97, 91 S.Ct. 1790, 1796, 29 L.Ed.2d 338 (1971) (section 1983 reaches private conspiracies even when there is no state involvement). Nevertheless, state action or involvement may be required "when the alleged conspiracy is aimed at a right that is by definition a right only against state interference ..." *United Brotherhood of Carpenters & Joiners v. Scott*, 463 U.S. 825, 833, 103 S.Ct. 3352, 3358, 77 L.Ed.2d 1049 (1983). The only constitutional provisions explicitly invoked by Dr. Quinn are the Fifth and Fourteenth Amendments, and these provisions secure rights against governments, not against private entities or individuals acting in their private capacity. Even so, Dr. Quinn's complaint does allege deprivation of "the right to equal protection of the laws," and the Court in *Griffin* specifically noted that the "deprivation of equal protection" referred to in section 1985(3) does not require that the action working the depri-

vation come from the state. *Griffin v. Breckenridge, supra*, 403 U.S. at 97, 91 S.Ct. at 1796.[7] However, the Griffin court also stated that "[t]he language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Id.* at 102, 91 S.Ct. at 1798.

While the Court in *Griffin* considered it an open question whether discriminatory intent other than racial bais would be actionable under section 1985(3) (*see id.* at 102, n. 9, 91 S.Ct. at 1798, n. 9), the Court addressed this issue more directly in *United Brotherhood of Carpenters & Joiners v. Scott, supra*. Scott was a non-union worker on a construction project that employed both union and non-union workers. Union members threatened violence if non-union workers failed to join the union and attacked the construction site, injuring non-union workers and destroying the employer's equipment. Scott and the company brought suit under section 1985(3) alleging a conspiracy to violate their First Amendment rights not to associate with the union, and the district court entered a judgment for the plaintiffs that was affirmed by the Fifth Circuit. The Supreme Court reversed, *inter alia*, on the ground that group action springing from an economic or commercial animus is not sufficient to satisfy the requirement of section 1985(3) set out in *Griffin* that there be "some

---

**6.** Although Dr. Quinn has not referred to a specific subsection of 42 U.S.C. § 1985, the circumstances alleged in his complaint make it clear that only section 1985(3) would be appropriate. 42 U.S.C. § 1985(3) reads, in relevant part:

"If two or more persons in any State or Territory conspire to go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws;' ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any

right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

**7.** *Griffin* involved a group of Negroes who were driving in their car when they were stopped by a group of whites, who mistook them for civil rights workers, and beaten up. The court found that the complaint alleged a conspiracy to deprive the plaintiffs of two constitutionally protected rights that did not implicate state action: the right to interstate travel and the right of Negro citizens under the Thirteenth Amendment to have the same rights the law secures to all free men.

racial, or perhaps otherwise class-based invidiously discriminatory animus behind the conspirators' action." While the court did not decide whether section 1985(3) reaches conspiracies based on some other kinds of non-racial animus, it held that it does not reach those with a merely economic motivation.

■ The discrimination alleged in Dr. Quinn's complaint could only be economically motivated. Because Dr. Quinn has failed to allege any racial or class-based discriminatory animus, the Court concludes that the complaint fails to state a cause of action under section 1985 and will enter summary judgment in favor of the defendants on this claim.

## III. SUMMARY JUDGMENT: The Antitrust Causes of Action

Dr. Quinn has raised a variety of antitrust claims in his complaint. He alleges that the Hospital's refusal to admit him to active staff privileges constitutes a group boycott and a combination and conspiracy in restraint of trade in violation of section 1 of the Sherman Act and an unlawful monopolization in violation of section 2 of the Sherman Act.

### A. Jurisdiction

Dr. Quinn alleges jurisdiction under the Sherman Act based on the assertion that the Hospital is engaged in interstate commerce in that it provides services to a "significant number" of out-of-state patients, purchases a "significant amount" of medical and surgical supplies from outside Delaware, purchases "significant amounts" of prescription drugs and hospital supplies from outside Delaware and receives "significant amounts" in payment of services from outside Delaware, including private insurance carriers and agencies of the federal government. Dr. Quinn also asserts that the individual physician defendants are engaged in interstate commerce for the same reasons.

■ The interstate commerce requirement for subject matter jurisdiction

under the Sherman Act may be satisfied if the challenged conduct is "in interstate commerce," or if the conduct being challenged is purely intrastate but has a "substantial and adverse effect" on interstate commerce. See *McLain v. Real Estate Board of New Orleans, Inc.*, 444 U.S. 232, 244–46, 100 S.Ct. 502, 510–11, 62 L.Ed.2d 441 (1980); *Cardio-Medical Associates v. Crozer-Chester Medical Center*, 721 F.2d 68, 71 (3d Cir.1983); *Weiss v. York Hospital*, 745 F.2d 786, 824 (3d Cir.1984). Since the operation of a hospital is plainly an intrastate activity, Dr. Quinn must show that the defendants' alleged conduct had a "substantial and adverse effect" on interstate commerce. Under the controlling precedents in the Third Circuit, this may be done by showing that the *defendants'* conduct itself had the requisite effect, even if it did not substantially affect the *plaintiff's* activities in interstate commerce. See *Weiss v. York Hospital, supra*, at 824–25; *Cardio-Medical Associates v. Crozer-Chester Medical Center, supra*, at 74–75. While Dr. Quinn's complaint is not specific enough to determine how substantially the defendants' alleged conduct has affected interstate commerce, there has been little discovery so far in this case, and many of Dr. Quinn's discovery requests are aimed at providing a more specific factual basis for his jurisdictional allegations. The Court holds, therefore, that Dr. Quinn has alleged sufficient jurisdictional facts at this stage of the proceedings.

### B. Affirmative Defenses

The defendants argue that they are entitled to summary judgment on the basis of a number of affirmative defenses to Dr. Quinn's antitrust claims, including the *Parker* doctrine, the alleged immunity conferred by the Delaware peer review statute, the *Noerr-Pennington* doctrine and the doctrine of charitable immunity. The Court will consider the merits of these various defenses in turn.

### 1. The Parker Doctrine

The defendants argue that their conduct in refusing to admit Dr. Quinn to active

staff privileges at the Hospital is immune from antitrust liability by virtue of the state action doctrine, first articulated in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), which exempts the anticompetitive actions of a state government from liability under the federal antitrust laws. To determine what constitutes "state action" for purposes of the *Parker* doctrine, the Supreme Court has developed a two-prong test. "First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised' by the state itself." *California Retail Liquor Dealers' Association v. Midcal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) (quoting *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 410, 98 S.Ct. 1123, 1135, 55 L.Ed.2d 364 (1978)). *Cf. Town of Hallie v. City of Eau Claire,* —— U.S. ——, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985) (active state supervision not required for exemption where actor is municipality rather than private party).

 It will be observed that the requirements for state action under the *Parker* doctrine are different from those under 42 U.S.C. § 1983. While the antitrust exemption for a private defendant under *Parker* and its progeny requires action pursuant to a clearly articulated state policy that is actively supervised by the state, state action may be made out under section 1983 if the plaintiff establishes either a nexus between the state and the particular activity being challenged such that the activity may be fairly treated as that of the state itself or a symbiotic relationship in which the state has so far insinuated itself into a position of interdependence with the defendant that it has to be recognized as a joint participant in the challenged activity. *See Holton v. Crozer-Chester Medical Center, supra,* at 338. The state action requirement for a section 1983 claim is weaker than the one needed to establish an antitrust exemption, since it is possible to satisfy the former without satisfying the latter, but not vice versa. For example, in *Burton v. Wilmington Parking Authori-*

*ty, supra,* a symbiotic relationship constituting state action sufficient to make out a section 1983 claim was present where a racially discriminating restaurant leased space from a municipal parking authority, even though there was no clearly articulated state policy of promoting racial discrimination. *See Braden v. University of Pittsburgh,* 477 F.2d 1 (3d Cir.1973) (complaint alleging sex discrimination in violation of section 1983 improperly dismissed for lack of state action where record failed to establish extent of symbiotic relationship between university and state); *Rackin v. University of Pennsylvania,* 386 F.Supp. 992 (E.D.Pa.1974) (state action sufficient for section 1983 claim present where university financially dependent on state). Similarly, the conduct of state officials will be treated as state action for purposes of section 1983, although the conduct is not expressly authorized by the state, or even contrary to state policy. *See Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). On the other hand, if it is established that conduct is undertaken in pursuance of a clearly articulated state policy and actively supervised by the state, there is no need for any further inquiry into whether the state action requirement of section 1983 has been satisfied. Since the Court has found, in the instant case, that there is no state action under section 1983, it follows that there can be no state action for purposes of the antitrust exemption under *Parker.*

Nevertheless, in view of the recent Supreme Court and courts of appeals cases expanding the scope of the state action exemption, the Court will consider the specific merits of the defendants' *Parker* defense. Once again, the defendants appeal to the Delaware medical peer review statute, 24 *Del.C.* § 1768, which provides immunity from all liability to members of peer review committees for good faith actions taken in pursuit of their duties. The defendants argue that their decision not to admit Dr. Quinn to active staff privileges at the Hospital is immune from liability under the Sherman Act because it was

taken pursuant to a state policy that was clearly articulated and affirmatively expressed in the Delaware peer review statute and because the implementation of this policy is actively supervised by the state. In support of their position, the defendants rely heavily on a recent decision in the Seventh Circuit, *Marrese v. Interqual, Inc.*, 748 F.2d 373 (7th Cir.1984), which held the state action exemption applicable in circumstances similar to those in the instant case.

*Marrese* involved an Indiana orthopedic surgeon who filed an antitrust and civil rights suit against a hospital and members of its peer review committee when the committee recommended termination of the surgeon's staff privileges because he was performing an excessive number of surgical procedures.[8] The Indiana peer review statute required hospitals to form peer review committees to evaluate the quality and necessity of medical treatment, to evaluate the qualifications of staff members and to review the merits of any recommendation against a staff member. *Id.* at 388. Members of such peer review committees were immune from any liability incurred in the good faith performance of their duties. *Id.* at 391. Under the Indiana statutory scheme, the Medical Licensing Board, appointed by the governor, reviewed the records and determinations of the peer review committees, and the Hospital Licensing Council continually reviewed the operation of each hospital and made recommendations to the State Board of Health on whether the hospital's license should be renewed. As part of this review, field inspectors were entitled to examine the confidential minutes of the peer review committees. *Id.* at 389–90. Because the Indiana statute *required* hospitals to institute a peer review process, the Seventh Circuit concluded that the defendants acted in accordance with a clearly articulated and affirmatively expressed state policy when they reviewed Marrese's surgical procedures and recommended that his staff priv-

ileges be revoked. And because the State of Indiana, through its Medical Licensing Board and Hospital Licensing Council, reviewed the records of peer review committees to determine if further action was required, the court also concluded that the other requirement of the state action exemption was satisfied and that the state actively supervised the peer review process it had mandated.

Dr. Quinn argues that the state action exemption is unavailable in the instant case because the State of Delaware, unlike the State of Indiana in *Marrese*, has not *compelled* the establishment of peer review committees. *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), which held that minimum fee schedules established by a state bar association were not immune from challenge under *Parker*, provided some justification for Dr. Quinn's position, but that justification has been removed by the Supreme Court's recent decision in *Southern Motor Carriers' Rate Conference, Inc. v. United States*, — U.S. —, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985), which held that collective ratemaking activities permitted by state statutes were exempt from antitrust scrutiny under *Parker*, even though they were not compelled by the states. The court noted that the true rationale of *Goldfarb* had not been the lack of compulsion by the state but the fact that it was the state bar association and not the state as sovereign, i.e., the state supreme court, that had acted. Consequently, there was no indication that the state itself had adopted a policy of minimum fee schedules. *Id.* at —, 105 S.Ct. at 1728.

Quite apart from the issue of compulsion, however, this Court is unable to adopt the reasoning of the Seventh Circuit in *Marrese*. The question confronting the Court is not merely whether Delaware has adopted a clearly articulated policy of promoting the medical peer review process but whether the legislature intended to displace

**8.** The district court in *Marrese* had found that there was no state action sufficient to sustain Marrese's civil rights claim under 42 U.S.C.

§ 1983, and, for reasons that are not clear, Marrese did not appeal this aspect of the district court's decision.

*competition* in the market for hospital facilities. *See City of Lafayette v. Louisiana Power & Light Co., supra,* 435 U.S. at 413, 98 S.Ct. at 1137 (state action exemption requires authorization of activities "pursuant to state policy to displace competition with regulation or monopoly public service"); *Town of Hallie v. City of Eau Claire, supra,* —— U.S. at —— -——, 105 S:Ct. at 1715–20 (same); *Southern Motor Carriers' Rate Conference, Inc. v. United States, supra,* —— U.S. at ——, 105 S.Ct. at 1730 (same); 1 P. Areeda & D. Turner, *Antitrust Law* ¶ 214 (1978).[9] While it is true that the clear articulation test does not require that the legislature "expressly state in a statute or its legislative history that it intends for the delegated action to have anticompetitive effects," *Town of Hallie v. City of Eau Claire, supra,* —— U.S. at ——, 105 S.Ct. at 1719, there is not even a hint in the Delaware statute that the peer review process will be promoted by conferring a monopoly upon those physicians with entrenched positions on hospital staffs. Nor is there any reason why promotion of the peer review process should require any additional restriction of competition. To be sure, this competition must occur within the boundaries of standards established by the medical profession and the state, and within the limits set by the capacity of the available hospital facilities, but there is no reason why the peer review process should be used to place additional restraints on competition among physicians. Indeed, the peer review process is arguably procompetitive, for by monitoring the qualifications and performance of physicians it may compensate for the relative lack of information about these matters by consumers.[10]

This analysis is consistent with the Supreme Court cases that have found a basis for the state action exemption. For example, in *Parker* itself the state policy at issue was a scheme for marketing raisins, one that clearly intended to "restrict competition among the growers and maintain prices in the distribution of their commodities to packers." *Id.* at 346. Similarly, in *City of Lafayette v. Louisiana Power & Light Co., supra,* the court held that a municipality's provision of electric utility service on a monopoly basis could be exempt under *Parker* if the municipality's conduct was authorized by the state, and in *New Motor Vehicle Board of California v. Orrin W. Fox Co.,* 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978), the court declared the Board's regulation of new automobile dealerships exempt under *Parker* on the ground that the California "Automobile Franchise Act's regulatory scheme is a system of regulation, clearly articulated and affirmatively expressed, designed to displace unfettered business freedom in the matter of the establishment and relocation of automobile dealerships." *Id.* at 109, 99 S.Ct. at 412. Likewise, in the two state action cases decided during the past term, the Supreme Court declared anticompetitive conduct exempt where the state had evinced a clear intention of displacing competition with regulation. *See Town of Hallie v. City of Eau Claire, supra,* (municipality's monopolization of sewage treatment facilities undertaken pursuant to state policy); *Southern Motor Carriers' Rate Conference, Inc. v. United States, supra,* (private motor carriers' collective rate setting authorized by state regulatory schemes).

*Hoover v. Ronwin,* 466 U.S. 558, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984), may ap-

---

**9.** *Cf.* P. Areeda, *Antitrust Law* ¶ 212.3 (Supp. 1982) ("A policy to displace the antitrust laws will ... be found if the challenged restraint of competition is a necessary consequence of engaging in the authorized activity.").

**10.** In *Marrese* the court was greatly concerned that denial of an antitrust exemption would frustrate the policy of the peer review statute by making physicians reluctant to serve on peer review committees. The Court finds this concern misplaced, since the relevant inquiry is not whether the exemption would foster the purpose of the statute but whether restriction of competition is a necessary consequence of engaging in the activity promoted by the statute. In most instances, these two conditions would probably converge, but in the case of peer review statutes it appears that they may not.

pear to point in a contrary direction. In *Hoover*, the Supreme Court explicitly rejected any limitation on the kind of state policy that can provide a basis for exempting state action. As the court declared, "[t]he reason that state action is immune from Sherman Act liability is not that the state has chosen to act in an anti-competitive fashion, but that the state itself has chosen to act." *Id.* 104 S.Ct. at 1998. *Hoover* involved an unsuccessful applicant for admission to the Arizona bar who challenged the grading policy of the Arizona Supreme Court's Committee on Examinations and Admissions on the ground that it was designed not to select qualified applicants but to artificially limit the number of attorneys admitted to practice in Arizona and, thus, to reduce competition among those already admitted. The court held that the Committee's conduct was exempt under *Parker* because it found that the real party in interest was the Arizona Supreme Court, which had delegated administration of the bar examination to the Committee and which made the final decision on who would be admitted to the bar.

■■■■■ The crucial difference between *Hoover* and the cases previously discussed is that in *Hoover* the Court found that the challenged conduct was that of the state itself, i.e., the state supreme court, acting as sovereign. For that reason, the clear articulation and active supervision requirements of the state action exemption were inapplicable. *Id.* at 1996. Where the state itself acts and does not merely authorize conduct by private parties or municipalities, there is no reason not to suppose that the state intended the consequences of its action. In the present case, however, it is not the State of Delaware itself that has acted, but a private hospital and its credentials committee. In such cases, the Court must

inquire whether the state did, in fact, intend to authorize anticompetitive conduct. Because there is no indication that the Delaware peer review statute was intended to displace competition, the Court concludes that the conduct of the Hospital and its credentials committee is not immune from liability under the Sherman Act.

■■■■■ While it is not necessary in order to reach this conclusion, the Court also finds that there is no state supervision sufficient to create an antitrust exemption in the present case. The Board of Medical Practice, the agency responsible for licensing physicians in the State of Delaware, does not review the proceedings of peer review committees. While a physician licensed to practice medicine in Delaware is required by 24 *Del.C.* § 1728(b) to report to the Board any changes in hospital privileges resulting from disciplinary action taken against him, the statute does not provide for review of such disciplinary action by the Board, and there is no statutory requirement that the Board even be notified if a credentials committee declines to admit a physician to a hospital staff. Nor does the Delaware statutory scheme provide for active supervision of the peer review process by the State Board of Health, the agency responsible for licensing hospitals. Although the Board of Health is authorized to issue rules and regulations governing hospitals and to make any investigations it may deem necessary, there is no statutory directive for the Board to review, or even become aware of, the decisions of peer review committees in Delaware. These circumstances fall far short of the active state supervision required for an exemption under *Parker*.[11]

### 2. *The Noerr-Pennington Doctrine*

■■■■■ The defendants also argue that their actions in denying Dr. Quinn admis-

---

**11.** The defendants also argue that, independent of the availability of a state action exemption under *Parker*, they are entitled to a presumption of good faith immunity under the Delaware peer review statute. It is elementary, however, that in the absence of state action or express federal statutory exemption federal antitrust law will preempt state law to the extent that the latter conflicts with it. "A conflict will be found

... where the state law stands as an obstacle to the accomplishment and execution of the purposes and objectives of Congress." *Edgar v. Mite*, 457 U.S. 624, 631, 102 S.Ct. 2629, 2635, 73 L.Ed.2d 269 (1982) (quoting *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 158, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978)). It is apparent that such conflict exists in the present case.

sion to active staff privileges at the Hospital are exempt under the *Noerr-Pennington* doctrine.[12] Under *Noerr-Pennington,* anticompetitive conduct may be permitted if it is part of an effort to influence the legislative or executive branch of government, or to secure rights through the courts. Thus, in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), the Supreme Court held that the Sherman Act was inapplicable to a conspiracy among railroads that obtained state legislative and executive action harmful to their trucking competitors, even though the railroads had used deceptive advertising practices as part of their efforts to influence the government. The primary ground of the Court's decision was the notion that the First Amendment protection afforded the right to petition government should not be restricted, even when it conflicts with the procompetitive policy promoted by the Sherman Act. It is evident, however, that this rationale is inapplicable in the present case. The conduct at issue here has nothing to do with petitioning government.[13] Nevertheless, the defendants would have the Court reason that, because the Delaware medical profession lobbied for the passage of the Delaware peer review statute, any action its members may take as part of the peer review process is protected from scrutiny under the antitrust laws. Dr. Quinn correctly notes that this bootstrap argument is absurd and, if applied consistently, would mean that any exercise of a governmentally conferred privilege was exempt if the actor had lobbied to obtain the privilege. Since the Delaware peer review statute itself provides no immunity to the defendants in the instant case and the challenged conduct is not part of an effort by them to influence govern-

ment, the *Noerr-Pennington* doctrine is simply inapplicable in the present context.

### 3. The Doctrine of Charitable Immunity

The defendants have also invoked the doctrine of charitable immunity, according to which charitable institutions such as hospitals are exempt from liability for the tortious actions of their employees and agents. Incredibly, the only two cases cited by the defendants in support of their position, *Durney v. St. Francis Hospital, Inc.,* 46 Del. 350, 83 A.2d 753 (1951), and *Vanaman v. Milford Hospital, Inc.,* 262 A.2d 263 (Del.Super.1970), *rev'd.,* 272 A.2d 718 (Del.1970), explicitly reject the doctrine of charitable immunity. The defendants argue, however, that the Delaware Supreme Court has not decided the question and that it is therefore up to this Court to determine how the Delaware Supreme Court would decide the issue if it were presented to it. But the Delaware Supreme Court has impliedly rejected the doctrine in the *Vanaman* case itself, where it reversed a grant of summary judgment to a defendant hospital on other grounds but left undisturbed the Superior Court's threshold decision that the hospital was liable for the negligent acts of its agents. Furthermore, even if charitable immunity were available under Delaware law, its application in the present case would be preempted by the federal antitrust laws—as the Court has noted with respect to the Delaware peer review statute. The most charitable thing the Court can say about the defendants' appeal to the doctrine of charitable immunity is that it is utterly without merit.

### C. The Substantive Antitrust Claims

The defendants argue that they are entitled to summary judgment on the antitrust

---

12. *See Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

13. The defendants' conduct in opposing the application of Dr. Quinn's medical group for a zoning variance to erect a sign advertising the availability of ambulatory surgery at the group's clinic, which is adjacent to the Hospital, is not relevant to the *Noerr-Pennington* issue. Dr. Quinn does not challenge the defendants' right to oppose his application for a variance, but merely cites their opposition as evidence of the competitive relationship between himself and the defendants.

**1242**

causes of action because a basic element of the alleged violation—a contract, combination or conspiracy in restraint of trade— does not exist and, alternatively, because any restraint of trade created by the defendants' conduct was reasonable.

### 1. The Contract, Combination or Conspiracy Requirement Under The Sherman Act [14]

The defendants argue that there could have been no contract, combination or conspiracy, as required by Dr. Quinn's Sherman Act claims, because the individual defendants are agents of the Hospital, and agents cannot conspire with their principal. Because the Hospital administrators, Klima and Reber, are employees of the Hospital and the individual physician defendants were appointed to the medical staff by the Hospital, the defendants maintain that the Hospital, its administration and its medical staff are really a single economic unit and that such a unit cannot, as a matter of law, engage in a combination or conspiracy with itself. While the defendants recognize that an agent can conspire with its principal to violate the Sherman Act if the agent has "an independent personal stake in achieving the object of the conspiracy ...", *H & B Equipment Co. v. International Harvester Co.*, 577 F.2d 239, 244 (5th Cir.1978), they argue that none of the individual defendants has a personal stake in granting or denying medical staff privileges to Dr. Quinn, since none is a competitor of Dr. Quinn.[15]

The issue here is thus not whether the members of the Hospital's medical staff are agents of the Hospital, but whether the individual physician defendants had independent interests that could have been furthered by excluding Dr. Quinn from the active medical staff. Dr. Quinn argues persuasively that they did. According to Dr. Quinn's theory, there were two contracts, combinations or conspiracies involved—one among the members of the medical staff and another between the medical staff and the Hospital. According to Dr. Quinn, the individual physician defendants were acting as agents of the medical staff and protecting the separate interests of its members, even if for some other purposes they must be considered agents of the Hospital. It is certainly true that, regardless of their specialty, the members of the Hospital's active medical staff have a financial interest in limiting the number of physicians admitted to active staff privileges at the Hospital, for all admitting staff members compete with one another for operating room facilities and the limited number of beds. Thus, as the Third Circuit has recently held, the active medical staff cannot be regarded as a single economic unit but must be viewed as a collection of independent economic actors who are capable of combining or conspiring with one another for purposes of the Sherman Act. *See Weiss v. York Hospital, supra*, at 814. As to the first combination or conspiracy alleged by Dr. Quinn—that among the members of the medical staff itself—the Court therefore holds that Dr. Quinn's allegations meet the requirement of Section 1 of the Sherman Act that there be a "contract, combination ... or conspiracy."

As to the second combination or conspiracy alleged by Dr. Quinn, how-

**14.** Section 1 of the Sherman Act, 15 U.S.C. § 1, proscribes "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States ...". Section 2 of the Sherman Act, 15 U.S.C. § 2, makes it a felony to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States ...". Dr. Quinn's complaint alleges violations of both section 1 and section 2. The section 2 allegation maintains that "[t]he defendants entered into a contract, combination or conspiracy to unlawfully prevent plaintiff from obtaining Active Staff privileges at Kent General Hospital, thereby preventing him from providing services to prospective patients in the Dover area in violation of § 2 of the Sherman Act (15 U.S.C. § 2)."

**15.** The defendants have pointed out that none of the individual physician defendants practices in the same specialty as Dr. Quinn, orthopedic surgery.

ever—that between the medical staff and the Hospital—the Third Circuit has held in the *Weiss* case that a "hospital cannot legally conspire with its medical staff." *Id.* at 815.[16] In view of *Weiss*, the Court must rule that Dr. Quinn's complaint fails to state a cause of action against the Hospital under section 1 of the Sherman Act.

 Dr. Quinn has also alleged a contract, combination or conspiracy, between the medical staff and the Hospital in violation of section 2 of the Sherman Act.[17] However, a contract, combination or conspiracy, is not a necessary element of a cause of action under Section 2, which proscribes monopolization or attempts to monopolize whether they are carried out by combinations or by individual economic actors. Thus, even though, under *Weiss*, the relation between the medical staff and the Hospital cannot be considered a combination or conspiracy as a matter of law, the allegations of Dr. Quinn's complaint are sufficient to state a cause of action against both the Hospital and the individual physician defendants under Section 2 of the Sherman Act. Although the Hospital could not have "conspired" with its medical staff within the meaning of the Sherman Act, Dr. Quinn's complaint may be fairly read as alleging that the Hospital, acting through its medical staff, unlawfully monopolized the relevant market for hospital facilities by preventing Dr. Quinn from obtaining active staff privileges at the Hospital. In addition, the Court understands the complaint as alleging that the medical staff itself combined or conspired to monopolize the relevant market for hospital facilities in the same way.

### 2. The Rule of Reason

The defendants also argue that a rule of reason analysis is appropriate in the present case and that they are entitled to summary judgment on the antitrust causes of action because the Hospital had a reasonable basis for denying active staff privileges to Dr. Quinn, namely, the need to insure that active staff members reside close enough to the Hospital to respond to medical emergencies in a timely fashion. As evidence of the reasonableness of the Hospital's decision, the defendants refer to the federal regulations setting out the conditions that must be satisfied by hospitals receiving federal funds. Specifically, the defendants appeal to 42 C.F.R. § 405.-1021(h):

(h) *Standard; all patients under physician's care.* The governing body is responsible for establishing a policy which requires that every patient must be under the care of a physician. The factors explaining the standard are as follows:

(1) Patients are admitted to the hospital only on the recommendation of a physician.

(2) A member of the house staff or other physician is on duty or on call at all times and available within 15 or 20 minutes at the most.

 The defendants are wrong in maintaining that this regulation establishes the "reasonableness" of their decision not to admit Dr. Quinn to active staff privileges. In the first place, it is clear that their decision was not compelled by the regulation. The regulation does not require that *all* active staff members reside within 15 or 20 minutes of the Hospital but merely that *some* member of the medical staff *or other physician* be available within 15 or 20 minutes to each patient at all times.

---

**16.** The reasons for the Third Circuit's holding are not entirely clear. The court stated that the medical staff was empowered to make staff privilege decisions on behalf of the hospital and, with respect to these decisions, operated as an officer of a corporation would in relation to the corporation, but the court also recognized that the members of the medical staff had independent economic interests of their own. The court appeared to place weight on the fact that the medical staff had no interest in *competition* with the hospital, but this is puzzling, since economic actors may combine for purposes of section 1 of the Sherman Act even if they are not competitors, as in the various vertical arrangements that are subject to proscription under section 1.

**17.** *See* note 14, *supra.*

Furthermore, a 15–20 minute rule is not necessarily equivalent to the 10–15 mile rule imposed by the credentials committee in Dr. Quinn's case. While it is admitted that Dr. Quinn lives more than 15 miles from the Hospital, there is a factual dispute as to whether Dr. Quinn could reach the Hospital from his home within 20 minutes.[18] Dr. Quinn also questions whether a 15–20 minute response time is appropriate for an orthopedist, and maintains that, in any case, the rule is not observed by the Hospital's emergency room staff.

More fundamentally, the defendants misconstrue the meaning of a rule of reason analysis. Such analysis would not merely consider whether the 10–15 mile rule imposed by the credentials committee is "reasonable" in the sense of being rationally related to legitimate purposes, such as insuring a high quality of effective medical treatment at the Hospital and limiting the Hospital's vicarious liability that might arise from improper staffing decisions. Rather, a rule of reason analysis would have to balance any possible benefit accruing to patients from the rule against the rule's anticompetitive effects in the market for hospital facilities. This analysis would require factual determinations as to the Hospital's need for the rule to maintain quality medical care, the definition of the relevant market, the market power of the Hospital and its medical staff and the actual effect of the rule on competition among physicians for hospital facilities. Such factual issues obviously make summary judgment impossible.

Dr. Quinn alleges that the defendants' conduct violates section 1 of the Sherman Act as a group boycott, which is a per se violation of the Act, and as an unreasonable restraint of trade, which would have to be tested under a rule of reason approach. The distinction between a per se rule and rule of reason analysis has never been entirely clear,[19] and in recent cases the Supreme Court has emphasized the importance of engaging in what amounts to a truncated rule of reason analysis before deciding whether to apply a per se rule.[20] Among the factors the courts should consider are the market power of the defendants, the probable effects of the alleged restraint on competition and the plausibility of any procompetitive justifications for the practice. Once again, however, these factors involve factual issues that make it inappropriate to determine the viability of Dr. Quinn's per se allegations at this stage of the proceedings.

## IV. THE DEFENDANTS' MOTION FOR A PROTECTIVE ORDER

The defendants have also filed a motion for a discovery protective order in response to Dr. Quinn's request for production of documents. The defendants have raised a number of global objections to all 27 of Dr. Quinn's requests as well as specific objections to individual requests. They argue first that all of Dr. Quinn's requests are irrelevant, because Dr. Quinn's complaint fails to state a cause of action under either the antitrust laws or the civil rights laws. These arguments largely duplicate the ones the Court has already considered in connec-

---

**18.** Dr. Quinn resides in Milford, Delaware, approximately 20 miles from the Hospital. Dr. Quinn maintains, but the Hospital denies, that he could reach the Hospital from his home within 20 minutes.

**19.** *See* Note, *Fixing the Price Fixing Confusion: A Rule of Reason Approach,* 92 Yale L.J. 706 (1983) (problematical nature of distinction between per se rule and rule of reason analysis).

**20.** *See Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.,* —— U.S. ——, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985) (per se analysis inapplicable where concerted activity not of type likely to result in predominantly

anticompetitive effects, not necessarily motivated by anticompetitive animus and may have procompetitive rationale); *NCAA v. Bd. of Regents of Univ. of Okla.,* —— U.S. ——, 104 S.Ct. 2948, 2962, n. 26, 82 L.Ed.2d 70 (*"Per se* rules may require considerable inquiry into market conditions before the evidence justifies a presumption of anticompetitive conduct"); *Jefferson Parish Hosp. Dist. v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) (per se rule against tying arrangements may be invoked only after it is first established that the defendant has market power).

tion with the defendants' motion for summary judgment. Because the Court is denying the motion for summary judgment with respect to the antitrust causes of action (with the exception of the claim against the Hospital under section 1 of the Sherman Act), it need not further consider these arguments here.

Next, the defendants argue that the requested documents are exempt from discovery under 24 *Del.C.* § 1768(b). The Court's holding that the Delaware peer review statute does not immunize the defendants against a federal antitrust cause of action is not necessarily dispositive of the issue regarding the discovery exemption conferred by the statute, since the non-statutory character of the Federal Rules of Civil Procedure does not implicate the same federal supremacy concern. Nevertheless, the courts have generally held that, when the requested discovery is necessary to sustain an antitrust cause of action, the federal interest in enforcing the antitrust laws should take precedence over the state interest in promoting the peer review process. For example, in *Memorial Hospital for McHenry County v. Shadur*, 664 F.2d 1058 (7th Cir.1981), the plaintiff brought an antitrust suit against the hospital for excluding him from its staff, and the hospital refused to comply with a request for production on the ground that the Illinois Medical Studies Act made the documents sought confidential and inadmissible as evidence. The court held that, under Fed.R. Evid. 501, because federal law supplied the rule of decision, the issue of privilege was to be determined by federal common law. The court concluded that the Sherman Act's policy of promoting open competition outweighed the state's policy of improving the effectiveness of the medical peer review process. As the court stated, "[t]he public interest in private enforcement of federal antitrust law in this context is simply too strong to permit the exclusion of relevant and possibly crucial evidence by application of the Hospital's privilege." *Id.* at 1063. *Accord Feminist Women's Health Center v. Mohammad*, 586 F.2d 530 (5th Cir.1978); *Robinson v. Magovern*, 83 F.R.D. 79 (W.D.Pa.1979). *Cf. Thompson v. General Nutrition Corp.*, 671 F.2d 100 (3d Cir.1982) (motion for protective order based on Pennsylvania statutory accountant-client privilege denied).

■ The discovery sought by Dr. Quinn is indispensable for establishing jurisdiction under the Sherman Act, for supporting his allegations of conspiracy and for probing the benign rationales for the 10–15 mile rule offered by the Hospital. In light of the strong federal interest in promoting private enforcement of the Sherman Act and Dr. Quinn's need for the requested documents to sustain his present cause of action, the Court concludes that the Delaware peer review statute does not bar discovery of the requested items.

The defendants also raise a general objection to Dr. Quinn's requests based on their form. They assert that Dr. Quinn's requests for production "resemble" interrogatories and that, if discovery is granted, the defendants should therefore have the option of making their records available to Dr. Quinn at the Hospital's place of business as provided by Fed.R.Civ.P. 33(c). This objection borders on the frivolous, since Dr. Quinn has requested documents, not answers. In any case, Dr. Quinn has expressed a willingness to examine the requested documents at the defendants' place of business.

■ The defendants also object specifically to requests nos. 1, 2, 3, 4, 18, 19 and 21 on the grounds that they are unduly burdensome, harsh, oppressive, vexatious and expensive. The basis of the defendants' position is their assertion that the documents sought by these requests (e.g., those relating to the number of out-of-state patients treated by the Hospital) are not available on their computer records and could only be obtained by an extremely time-consuming manual search of the Hospital's files. The Hospital is also concerned that records needed for its daily operations should not be removed from the Hospital's premises. In view of Dr. Quinn's expressed willingness to inspect the request-

ed documents at the Hospital's place of business, this concern has been met. As to the difficulty in retrieving the information being sought, the Hospital need only provide Dr. Quinn with as good an access to the documents as the Hospital itself has. If the requested documents can only be retrieved by a time-consuming manual file search that would be as burdensome for the Hospital to perform as it would be for Dr. Quinn, then it will be up to Dr. Quinn to perform the search, based on the directions supplied by the Hospital, but the burdensomeness of the search is not a basis for barring discovery of the requested items.

■ The defendants' objection on the basis of overbreadth to request no. 17, which seeks documents relating to the nature of the orthopedic services provided by the Hospital, is without merit.

■ Finally, the defendants object to requests nos. 1, 2, 3, 4, 18 and 19 on the grounds that they may require revelation of information protected by the Delaware physician-patient privilege. The defendants' reliance on Delaware Rule of Evidence 503 to support their position is misplaced, since the issue of privilege in the present case is a matter of federal common law. *See Memorial Hospital for McHenry County v. Shadur, supra; Feminist Women's Health Center v. Mohammad, supra; Robinson v. Magovern, supra.* As to the federal antitrust claims, the Court has already noted that the federal interest in promoting private enforcement of the Sherman Act should prevail over the state's interest in improving the quality of the peer review process. In addition, the Third Circuit has recently noted that "when there are federal law claims in a case also presenting state law claims, the federal rule favoring admissibility, rather than any state law privilege, is the controlling rule." *Thompson v. General Nutrition Corp., supra,* at 104. Thus, the defendants' objection to Dr. Quinn's requests on the basis of the state physician-patient privilege is untenable. The Court notes, however, as the parties seem to recognize, that there is

no need for revealing the identities of individual patients in the present case. The defendants may either produce the relevant documents with all references to patients' names deleted or submit a protective order that will insure the confidentiality of this information.

An order will issue in accordance with this opinion.